IN RE APPLICATIONS A-16027, A-16028, A-16031, A-16032, A-16033, A-16036, A-16038, A-16039, A-16600, A-16603, AND A-16606.
UPPER BIG BLUE NATURAL RESOURCES DISTRICT, APPELLANT, V. CITY OF FREMONT ET AL., APPELLEES.
495 N.W.2d 23

Filed January 29, 1993.    No. S-92-024.

Steven G. Seglin, of Crosby, Guenzel, Davis, Kessner & Kuester, for appellant.

Lyle B. Gill, Fremont City Attorney, for appellee City of Fremont.

George E. Svoboda, of Sidner, Svoboda, Schilke, Thomsen, Holtorf & Boggy, for appellees Lower Platte North Natural Resources District and National Audubon Society.

James E. Doyle IV, of Cook, Wightman & Doyle, for appellee Central Platte Natural Resources District.

Bridgitt B. Erickson, Platte County Attorney, for appellee County of Platte.

BOSLAUGH, WHITE, CAPORALE, GRANT, and FAHRNBRUCH, JJ., and BLUE, D.J., and COLWELL, D.J., Retired.

GRANT, J.

Applicant, Upper Big Blue Natural Resources District (Upper Big Blue), appeals the December 16, 1991, order of the director of the Department of Water Resources, denying Upper Big Blue's applications to make intrabasin and interbasin diversions of unappropriated waters from the Platte and Blue Rivers. Upper Big Blue timely appealed to this court.

The six errors assigned by Upper Big Blue may be divided

into two categories. The first category is made up of four attacks on the constitutionality of various Nebraska statutes and subsections of such statutes; the second category is directed to the alleged errors in the director's rulings in view of the alleged unconstitutionality of the various statutes. Since we hold that the attacked statutes are constitutional, we do not reach these last two assigned errors.

The lengthy record before the director shows the facts as hereinafter set out. On December 17, 1981, Upper Big Blue filed 14 applications with the Department of Water Resources, seeking to divert unappropriated waters from the Platte and Blue Rivers for a water-based-resources venture known as the Landmark Project. The project was intended to replace and replenish dwindling ground water supplies located under project lands.

In addition to a right for direct irrigation from natural flow of the Platte River, Upper Big Blue applied for the right to impound water from the Platte and from the west fork of the Big Blue River in six reservoirs. These reservoirs were to be designed to provide water for an estimated 114,000 acres. The areas involved included York, Hamilton, Butler, Polk, Seward, Clay, and Fillmore Counties. Seven of the applications sought the transfer of Platte River flows to the Blue River basin. These applications involved an interbasin transfer. In March 1983, the department, pursuant to the Nongame and Endangered Species Conservation Act (NESCA), Neb. Rev. Stat. §§ 37-430 to 37-438 (Reissue 1978), directed Upper Big Blue to consult with the Nebraska Game and Parks Commission (Game Commission). Section 37-435(3) of NESCA, as in effect at the time of the original applications herein, provided in relevant part:

All other state departments and agencies shall, in consultation with and with the assistance of the commission, utilize their authorities in furtherance of the purposes of sections 37-430 to 37-438 by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 37-434, and by taking such action necessary to insure that actions authorized, funded, or carried out by them do not

jeopardize the continued existence of such endangered or threatened species or result in the destruction or modification of habitat of such species which is determined by the commission to be critical. [For purposes of this subsection, state agency shall mean any department, agency, board, bureau, or commission of the state or any corporation whose primary function is to act as, and while acting as, an instrumentality or agency of the state, except that state agency shall not include a natural resources district or any other political subdivision.]

When § 37-435(3) was amended in 1987, the sentence set out above in brackets was added. This amendment apparently operated to remove the statutory requirement (originally set out in § 37-435(3) and made operative by the case of *Little Blue N.R.D. v. Lower Platte North N.R.D.*, 210 Neb. 862, 317 N.W.2d 726 (1982) (*Little Blue II*)) that a natural resources district consult with the Game Commission on matters concerning endangered species before obtaining a water permit. In *Little Blue II*, we stated:

"An administrative agency is required to act under the law as it stands when its order is entered. A change of law pending an administrative determination must be followed and the new law applied, at least in relation to permits for the doing of future acts, unless the statute contains a saving clause."

210 Neb. at 874, 317 N.W.2d at 734 (quoting 2 Am. Jur. 2d *Administrative Law* § 326 (1962)). Although this issue was not raised by any of the parties to this case, it is apparent that § 37-435(3), as in effect at the time of the original applications, is not applicable to the case at bar. As stated above, an administrative agency such as the department must apply the law as it stands when it enters its order, which in this case was December 1991. Nonetheless, the public policy of Nebraska, as set out in Neb. Rev. Stat. §§ 2-3229 and 46-209 (Cum. Supp. 1992) and 46-2,107 (Reissue 1988), remains that Nebraska is committed to the policy of protecting endangered species. The department needed information on this subject and obtained such information from the Game Commission. In this opinion, we will not determine the constitutionality of § 37-435(3)

(Cum. Supp. 1992) because, at this point in time, Upper Big Blue cannot contend it is affected by that statute, as amended.

We note, in passing, that in many areas of the law (e.g., liquor laws, tax laws, water laws), the law changes yearly, and if an appellant desires to attack the constitutionality of a statute, such an appellant would be well advised to tell the reviewing court just what statute the appellant is complaining about.

Upper Big Blue complied with the directive and filed with the department a biological opinion issued by the Game Commission in May 1986. The opinion concluded as to the Big Blue diversion:

> It is the biological opinion of the Game and Parks Commission that the Big Blue (Landmark) project, consisting only of the proposed Platte River diversion below Grand Island (described as the Big Blue diversion), with or without Prairie Bend, Catherland, Twin Valley, and Plum Creek Reservoir, will not jeopardize the continued existence of the whooping crane, bald eagle, or the peregrine falcon or result in the destruction or adverse modification of critical habitat, assuming habitat flow requirements are met by all projects. The Big Blue diversion will not jeopardize the continued existence of the least tern or the piping plover with the stipulations providing for the conservation of the least tern and piping plover as described in the conservation program section of this biological opinion. No further consultation is needed.

As to the Plum Creek Reservoir, the opinion concluded:

> The portion of the Big Blue (Landmark) project, consisting only of the operation of the proposed Plum Creek Reservoir without the Prairie Bend, Catherland, and Twin Valley projects, will not jeopardize the continued existence and will promote the conservation of the whooping crane, bald eagle, least tern, and the piping plover with the stipulations providing for the conservation of the whooping crane, least tern, and piping plover as described in the conservation program section of this opinion. Operation of Plum Creek Reservoir, with or without Prairie Bend, Catherland, and Twin Valley projects will not jeopardize the peregrine falcon or result

in the destruction or adverse modification of critical habitat. Operation of Plum Creek Reservoir with the Prairie Bend, Catherland, and Twin Valley projects as proposed, will jeopardize the continued existence of the whooping crane, bald eagle, least tern, and the piping plover. The cumulative impacts of these four projects would be expected to reduce appreciably the likelihood of the survival or recovery of the four species within the State of Nebraska by reducing the distribution of and adversely modifying or destroying migration habitat (feeding, loafing, and roosting) for the whooping crane; by reducing the distribution of and adversely modifying or destroying winter habitat (feeding) for the bald eagle; and by reducing the reproduction, numbers and distribution of and adversely modifying or destroying summer habitat (nesting, and feeding) for the least tern and piping plover. Additional consultation is needed and recommended, if reasonable and prudent alternatives are to be developed.

Finally, the Game Commission's opinion stated:

Should significant changes be made in the design and operation of the Big Blue project involving the Big Blue diversion and/or Plum Creek Reservoir, or in the operation of Prairie Bend, Catherland, and Twin Valley, consultation will need to be reinitiated. The Commission should be informed of such changes so that impact on endangered or threatened species may be determined.

After the issuance of the May 1986 Game Commission opinion, Upper Big Blue scaled down the Landmark Project. In October 1987, Upper Big Blue filed with the department a "Motion to Amend and Withdraw Applications" and in November 1987 filed a "Motion for Leave to File Amended Applications and to Withdraw Other Applications." Also during November 1987, three additional applications were filed. Upper Big Blue then reinitiated consultation with the Game Commission. The Game Commission rendered a supplemental opinion on December 22, 1987, which reaffirmed the original biological opinions of the Game Commission. As a result of the amended and withdrawn applications, the Landmark Project was reduced from six to two reservoirs.

The amended and new applications proposed that water from the Platte and Blue Rivers be used to provide surface irrigation to an estimated 67,000 acres and to recharge the ground water of an estimated 20,000 acres.

Numerous parties objected to the amended and new applications. Several of these parties were included in the proceedings: the City of Fremont; Lower Platte North Natural Resources District; Central Platte Natural Resources District; Twin Valley Conservation Association, Inc.; Metropolitan Utilities District of Omaha; Central Nebraska Conservation Association, Inc.; Catherland Reclamation District; and the National Audubon Society.

An evidentiary hearing began on April 30, 1990, and continued until June 8. The written transcript fills more than 4,300 pages. Under § 37-435(3) of NESCA, a formal consultation with the Game Commission was initiated following the hearing. The Game Commission's official biological opinion for the amended project was filed on November 14, 1990. The opinion concluded:

> It is the biological opinion of the Game and Parks Commission that the Landmark project will jeopardize the continued existence of the least tern and the piping plover. The project's diversion from the Platte River, as currently proposed, would be expected to reduce appreciably the likelihood of the survival or recovery of these species within the State of Nebraska. The diversion would reduce and adversely modify the reproduction, numbers, and distribution of the least tern through the adverse modification or destruction of habitat for fish species utilized as food by the least tern, and would reduce the the [sic] reproduction numbers, and distribution of the least tern and piping plover . . . through the adverse modification or destruction of breeding habitat.
>
> . . . .
> Current information concerning the western prairie fringed orchid, American burying beetle and the pallid sturgeon and the project's effects is not sufficient to make a determination as to whether the project will jeopardize their continued existence.

The opinion further provided that additional studies were necessary to make a determination as to whether the Landmark Project would jeopardize the further existence of the western prairie fringed orchid, the American burying beetle, and the pallid sturgeon.

As a result of this second biological opinion, another evidentiary hearing began on March 25, 1991, and ended on March 28. An additional 900 pages of testimony were added to the record.

All of Upper Big Blue's amended and new applications (six interbasin transfers and five intrabasin proposals) were considered throughout the proceedings as a single package. The parties understood that the project could not be successfully pursued if one group of applications was approved and the other was not. Consequently, the participants directed their attention and efforts to the provisions of Neb. Rev. Stat. §§ 46-288 and 46-289 (Reissue 1988), which set out the factors to be considered in evaluating applications for interbasin transfers. The department order also stated, "In addition to those requirements, however, all other applicable provisions of Chapter 46, Article 2 and §§ 37-430 through 37-438 were applied."

In deciding Upper Big Blue's applications, the director specifically considered:

a. Whether there was unappropriated water in the sources of supply. (Neb. Rev. Stat. § 46-234 (Reissue 1988) provides that if there is no unappropriated water in the source of supply, the department may refuse such application.)

b. If prior appropriations have been perfected to water the same lands identified in Upper Big Blue's project. (Section 46-234 provides that if a prior appropriation has been perfected to water the same land to be watered by the applicant, the department may refuse such application.)

c. If existing facilities other than those owned or operated by Upper Big Blue are to be used by it. (Section 46-234 provides that an application may be refused if such facilities are to be used and the applicant fails to show, by documentary evidence, agreements with the owner and operator of the facilities to allow the applicant to use such facilities.)

d. Whether the Platte River exceeds 100 feet in width at the proposed location of diversion (as required by Neb. Rev. Stat. § 46-206 (Reissue 1988)).

e. Whether Upper Big Blue's applications and appropriations, when perfected, are not otherwise detrimental to the public welfare (Neb. Rev. Stat. § 46-235 (Reissue 1988)).

f. Whether denial of the applications is demanded by consideration of the public interest as provided in §§ 46-234, 46-235, and 46-289, which considerations include, but are not limited to (1) the economic, environmental and other benefits of the proposed interbasin transfer and use; (2) any adverse impacts of the proposed interbasin transfer and use; (3) any current beneficial uses being made of the unappropriated water in the basin of origin; (4) any reasonable foreseeable future beneficial uses of the water in the basin of origin; (5) the economic, environmental, and other benefits of leaving the water in the basin of origin for future beneficial uses; (6) alternative sources of water supply available to Upper Big Blue; and (7) alternative sources of water available to the basin of origin for future beneficial uses.

g. If constructed and operated, whether the project would jeopardize endangered or threatened species or their habitat.

In connection with issue f, § 46-289 provides, in part: "The application shall be deemed in the public interest if the overall benefits to the state and the applicant's basin are greater than or equal to the adverse impacts to the state and the basin of origin."

The director entered the order on December 16, 1991, finding in favor of Upper Big Blue on issues a through e and against Upper Big Blue on issues f and g. As a result of the director's findings on issues f and g, Upper Big Blue's applications were denied.

The order concluded:

The law in Nebraska is clear. It is specified in § 37-435 and was discussed by the Supreme Court in *Little Blue NRD v. Lower Platte North NRD* (Little Blue II) 210 Neb. 862 (1982). For Landmark's applications to be approved, Applicant bears the burden of proving that its Project will not jeopardize nongame or endangered species or their

habitat. . . . [I]f that conclusion cannot be reached, the Director is obligated to turn down Landmark's requests.

Such a conclusion could not be reached for the pallid sturgeon, the burying beetle and the prairie fringed orchid. Although it was demonstrated that the Commission's conclusions regarding the piping plover and the interior least tern were not compelling, Applicant failed to establish that its Project would not jeopardize those bird species.

For these reasons, Landmark's application must be rejected.

As stated above, Upper Big Blue assigns four errors in its appeal contesting the constitutionality of various statutory provisions relied upon by the director in formulating his decision. The first assignment of error contends that

Section 37-435(3) of the Nongame and Endangered Species Conservation Act, Neb. Rev. Stat. §§37-430 to 37-435 (1988, Cum. Supps. 1990 and 1991) ("NESCA"), is unconstitutional because the prohibition contained therein denied to Upper Big Blue its substantive right to divert unappropriated waters for irrigation purposes, which is otherwise guaranteed by Neb. Const. art. XV, §§4, 5, and 6.

In its second assignment of error, Upper Big Blue contends that

Neb. Rev. Stat. §§46-288 and 46-289 (1988), are unconstitutional because the factors contained therein, which are required to be considered by the Director in determining whether an application for interbasin transfer and use should be granted, denied to Upper Big Blue its substantive right to divert unappropriated waters for irrigation purposes, which is otherwise guaranteed to it by Neb. Const. art. XV, §§4, 5, and 6.

In its third assignment of error, Upper Big Blue contends that [s]ubsection[s] (4) and (5) of §46-289, are unconstitutional because the factors contained therein, which are required to be considered by the Director in determining whether an application for interbasin transfer and use should be granted, denied to Upper Big Blue the protection of the

doctrine of prior appropriation, which is otherwise guaranteed by Neb. Const. art. XV, §§4, 5, and 6.

In its fourth assignment of error, Upper Big Blue contends that the "Legislature, by enacting §§46-288 and 46-289, usurped the power of the judiciary contrary to Neb. Const. art. V, § 1," which provides that "[t]he judicial power of the state shall be vested in a Supreme Court, district courts, county courts . . . and such other courts inferior to the Supreme Court as may be created by law."

The proper standard of review for this court to follow in cases involving appeals from the department under the provisions of Neb. Rev. Stat. § 46-210 (Cum. Supp. 1992) is to search only for errors appearing in the record, i.e., to determine whether the judgment conforms to law, is supported by relevant evidence, and is not arbitrary, capricious, or unreasonable. *In re Applications A-14137, A-14138A, A-14138B, and A-14139*, 240 Neb. 117, 480 N.W.2d 709 (1992); *In re Applications A-15145, A-15146, A-15147, and A-15148*, 230 Neb. 580, 433 N.W.2d 161 (1988); *In re Application U-2*, 226 Neb. 594, 413 N.W.2d 290 (1987).

The constitutionality of a legislative act can be raised for the first time on a direct appeal to the Supreme Court from a decision of an administrative agency. *Golden Five v. Department of Soc. Serv.*, 229 Neb. 148, 425 N.W.2d 865 (1988); *Metropolitan Utilities Dist. v. Merritt Beach Co.*, 179 Neb. 783, 140 N.W.2d 626 (1966). The power to declare an act of the Legislature unconstitutional is a judicial power reserved solely to the courts under the division of powers between the legislative, executive, and judicial branches of government set forth in the Nebraska Constitution. The department is an administrative agency and, as such, has no authority to declare an act of the Legislature unconstitutional. *Metropolitan Utilities Dist., supra.*

The applicable law concerning statutory construction when the constitutionality of a statute has been attacked is well established. First, a statute is presumed to be constitutional, and all reasonable doubts will be resolved in favor of its constitutionality. *In re Application A-16642*, 236 Neb. 671, 463 N.W.2d 591 (1990); *Distinctive Printing & Packaging Co. v.*

*Cox*, 232 Neb. 846, 443 N.W.2d 566 (1989). Further, the party claiming a statute to be unconstitutional has the burden of establishing its unconstitutionality. *Haman v. Marsh*, 237 Neb. 699, 467 N.W.2d 836 (1991); *In re Application A-16642, supra.* The unconstitutionality of a statute must be clearly demonstrated before a court can declare the statute unconstitutional, and all reasonable doubts will be resolved in favor of its constitutionality. *Haman v. Marsh, supra; State ex rel. Spire v. Beermann*, 235 Neb. 384, 455 N.W.2d 749 (1990); *In re Application U-2, supra.* The Nebraska Supreme Court is also obligated to endeavor to interpret a challenged statute in a manner consistent with the Nebraska Constitution. *In re Application A-16642, supra; In re Application U-2, supra.*

Upper Big Blue's first two assignments of error contend that the considerations contained within §§ 37-430 to 37-438, 46-288, and 46-289, which are to be evaluated by the director in considering applications for interbasin water transfers, are unconstitutional because they deny Upper Big Blue the substantive right to divert unappropriated waters which is otherwise guaranteed by Neb. Const. art. XV, §§ 4, 5, and 6.

Upper Big Blue's position is that the statutory considerations in §§ 37-435(3), 46-288, and 46-289 are invalid limitations on the constitutional right to divert unappropriated waters. The relevant sections of the Nebraska Constitution provide as follows: "The necessity of water for domestic use and for irrigation purposes in the State of Nebraska is hereby declared to be a natural want." Neb. Const. art. XV, § 4. "The use of the water of every natural stream within the State of Nebraska is hereby dedicated to the people of the state for beneficial purposes, subject to the provisions of the following section." Neb. Const. art. XV, § 5.

The right to divert unappropriated waters of every natural stream for beneficial use shall never be denied except when such denial is demanded by the public interest. Priority of appropriation shall give the better right as between those using the water for the same purpose, but when the waters of any natural stream are not sufficient for the use of all those desiring to use the same, those using the water for domestic purposes shall

have preference over those claiming it for any other purpose, and those using the water for agricultural purposes shall have the preference over those using the same for manufacturing purposes. Provided, no inferior right to the use of the waters of this state shall be acquired by a superior right without just compensation therefor to the inferior user.

Neb. Const. art. XV, § 6.

It is clear that nothing in the above provisions guarantees a party the right to divert unappropriated waters. The question, then, becomes one of the effect to be given to the qualifier contained in article XV, § 6: "The right . . . shall never be denied except when such denial is demanded by the public interest."

Upper Big Blue would have the court conclude that although this limitation is not defined within the Nebraska Constitution, the statutory guidelines "go way beyond" what is required to delineate the meaning of public interest. Brief for appellant at 24. In essence, the argument goes, the constitutional proviso is clear upon its face, and no further construction is required.

Before proceeding with an analysis of this point, it must be remembered that neither constitutional nor statutory provisions are open to construction as a matter of course. *In re Application A-16642*, 236 Neb. 671, 463 N.W.2d 591 (1990); *Muller v. Thaut*, 230 Neb. 244, 430 N.W.2d 884 (1988); *Gaffney v. State Department of Education*, 192 Neb. 358, 220 N.W.2d 550 (1974). Construction of a constitutional clause is appropriate only when it has been demonstrated that its meaning is not clear and that construction is necessary. *In re Application A-16642, supra*; *State ex rel. Spire v. Public Emp. Ret. Bd.*, 226 Neb. 176, 410 N.W.2d 463 (1987). Stated another way, the issue is whether §§ 4, 5, and 6 of article XV of the Nebraska Constitution are self-executing.

The standard for such an interpretation has been set forth by the Nebraska Supreme Court in *State, ex rel. Walker, v. Board of Commissioners*, 141 Neb. 172, 179, 3 N.W.2d 196, 200 (1942):

"Constitutional provisions are not self-executing if they merely indicate a line of policy or principles, without supplying the means by which such policy or principles are

to be carried into effect, or if the language of the Constitution is directed to the legislature, or it appears from the language used and the circumstances of its adoption that subsequent legislation was contemplated to carry it into effect."

This standard requires that three distinct inquiries be made concerning article XV, §§ 4, 5, and 6: (1) whether the constitutional provisions merely indicate a line of policy to be followed, without a corresponding means of implementation; (2) whether the language is directed toward the Legislature, giving it the power to enact means of implementation; or (3) whether it appears from the language of the sections or the circumstances of their adoption that subsequent legislation was contemplated to provide the means of implementation. Under *State, ex rel. Walker, supra*, if any of these tests are satisfied, the constitutional provisions in question are not self-executing.

In *State ex rel. Western Technical Com. Col. Area v. Tallon*, 196 Neb. 603, 606, 244 N.W.2d 183, 186 (1976), the following rule of constitutional interpretation was set out: " '[E]ffect must be given to the intent of the framers of the organic law and of the people adopting it. This is the polestar in the construction of constitutions.' " In the instant case, a summary of the history of the circumstances surrounding the adoption of article XV, §§ 4, 5, and 6, is enlightening:

The primary author of the amendments was Joseph G. Beeler, Chairman of the Water Power and Natural Resources Committee of the Constitutional Convention of 1919-1920, the Committee which drafted and submitted article XV, sections 4-6, for approval. Although the three sections were submitted to the Convention as a unit, Beeler took the time to address each section individually before the delegates to the Convention.

Regarding section 4 (declaring water to be a "natural want"), Beeler stated somewhat uncritically: "It is a declaration which intends to give to irrigation the standing of being so necessary that it is considered as a natural want."

Regarding section 5 (dedicating water to the beneficial use of the public), he spoke at greater length, explaining

that the provision expressed Nebraska's opposition to the water policies of the state of Colorado. . . . Section 5 was meant to express Nebraska's view that rights to water are use rights, not full fee interests.

The Chairman characterized section 6 (declaring that the right to divert unappropriated waters of any stream shall not be denied unless demanded by the public interest) as an assurance that Nebraska would not do what Colorado was attempting to do, *i.e.*, to eliminate prior vested appropriative rights: "Section [6] is a limitation upon the right of the Legislature of the state to do such a thing. The first is that the right to divert unappropriated waters of every natural stream for beneficial use shall never be denied. That is, if this becomes a part of the Constitution, the Legislature of the State of Nebraska will have no right to pass any law which will deny . . . the right to appropriate unappropriated waters of the stream except when such denial is demanded by the public interests."

Eric Pearson, *Constitutional Restraints on Water Diversions in Nebraska: The Little Blue Controversy*, 16 Creighton L. Rev. 695, 707-08 (1983) (quoting 2 Proc. Const. Convention 1915 (1919-1920)).

The tests set out in *State, ex rel. Walker, v. Board of Commissioners, supra*, therefore, should be applied to each of the provisions at issue with the above-stated history in mind.

The first test provides that a provision is not self-executing if it merely stipulates a line of policy, but does not supply the means with which to effectuate that policy. Article XV, § 4, declaring water to be a "natural want," only declares the importance of water as a necessity for domestic use and for irrigation. Section 5, dedicating water to the beneficial use of the public, defines the scope of water rights in Nebraska. Section 6, however, declaring that the right to divert unappropriated waters of any stream shall not be denied unless demanded by the public interest, is a declaration of policy. As is clear from the history, § 6 is a limitation on the right of the Legislature to enact laws denying the right to appropriate water except for public interest reasons.

The three sections together serve to enunciate the policy of the framers concerning water rights and their importance to the state. However, article XV, §§ 4, 5, and 6, do not set out any means by which to implement these policies. The limits of such means are defined by § 6, but the means themselves are not designated.

The second test states that if the language is directed to the Legislature, giving it the power to enact means of implementation, then the section is not self-executing.

As stated above, §§ 4, 5, and 6 of article XV are only statements of policy. The Legislature is empowered to execute these policies through legislative directives. This view is supported by Beeler's statement contained in the constitutional history: " 'Section [6] is a limitation upon the right of the Legislature' " " 'to pass any law which will deny . . . the right to appropriate unappropriated waters of the stream except when such denial is demanded by the public interests.' " 2 Proc. Const. Convention at 1915. It is apparent from this limitation that the framers intended that legislation be enacted to effect these policies, but that it be confined to the stated principles. These considerations also serve to affirmatively answer the third inquiry, namely whether the provisions contemplated subsequent legislation to carry them into effect.

In summary, all three parts of the test in *State, ex rel. Walker, v. Board of Commissioners*, 141 Neb. 172, 3 N.W.2d 196 (1942), are met by article XV, §§ 4, 5, and 6. *State, ex rel. Walker*, requires only that one of the queries be satisfied for a constitutional provision to be considered not self-executing. We determine that neither § 4, § 5, nor § 6 of article XV is self-executing. Any references to the contrary in *Little Blue II* are overruled.

This view is supported by *In re Application A-16642*, 236 Neb. 671, 690, 463 N.W.2d 591, 605 (1990): "The relevant clause of § 6 simply permits the state to deny appropriations based upon the dictates of the public interest. It does not prescribe the manner by which the public interest is to be determined nor the mechanisms by which it may be accomplished." We also stated that the statutes at issue in the case could "be viewed as a mechanism for determining whether

the public interest demands that the right to appropriate water from a given stream should be denied." *In re Application A-16642,* 236 Neb. at 689, 463 N.W.2d at 604.

The next step, then, is to examine the statutes attacked by Upper Big Blue as unconstitutional to determine whether they properly implement the policies set out in the relevant constitutional provisions.

Upper Big Blue first argues that § 37-435(3) of NESCA impermissibly limits or alters the rights guaranteed by article XV, § 6, and is therefore unconstitutional. For the reasons set out above, we will not determine this assignment of error.

In its second assignment of error, Upper Big Blue argues that §§ 46-288 and 46-289 also impermissibly limit or alter the rights guaranteed by article XV, § 6, and are therefore unconstitutional. Section 46-288 defines the terms relating to interbasin transfers, including beneficial uses: "Beneficial use shall include, but not be limited to, reasonable and efficient use of water for domestic, municipal, agricultural, industrial, commercial, power production, subirrigation, fish and wildlife, ground water recharge, an interstate compact, water quality maintenance, or recreational purposes." Section 46-289, in setting out factors to be considered by the department when evaluating an application for an interbasin transfer, provides in relevant part:

> The Legislature finds . . . that the transfer of water to outside the boundaries of a river basin may have impacts on the water and other resources in the basin and that such impacts differ from those caused by uses of water within the same basin. . . . The Legislature therefore recognizes the need to delineate factors for consideration by the Director of Water Resources when evaluating an application made pursuant to section 46-233 which involves an interbasin transfer of water in order to determine whether denial of such application is *demanded by the public interest.* Those considerations shall include, but not be limited to, the following factors:
>
> (1) The economic, environmental, and other benefits of the proposed interbasin transfer and use;
>
> (2) Any adverse impacts of the proposed interbasin

transfer and use;

    (3) Any current beneficial uses being made of the unappropriated water in the basin of origin;

    (4) Any reasonably foreseeable future beneficial uses of the water in the basin of origin;

    (5) The economic, environmental, and other benefits of leaving the water in the basin of origin for current or future beneficial uses;

    (6) Alternative sources of water supply available to the applicant; and

    (7) Alternative sources of water available to the basin of origin for future beneficial uses.

    The application shall be deemed in the public interest if the overall benefits to the state and the applicant's basin are greater than or equal to the adverse impacts to the state and the basin of origin. The director's order granting or denying an application shall specify the reasons for such action, including a discussion of the required factors for consideration, and shall document such decision by reference to the hearing record, if any, and to any other sources used by the director in making the decision.

(Emphasis supplied.)

    In *In re Application A-16642*, 236 Neb. at 689, 463 N.W.2d at 604, we held that the "constitutional right to appropriate [water under the Nebraska Constitution] can and must be limited by the demands of the public interest." In examining the instream flow appropriation statutes, Neb. Rev. Stat. §§ 46-2,107 to 46-2,119 (Reissue 1988), we stated that they could "be viewed as a mechanism for determining whether the public interest demands that the right to appropriate water from a given stream should be denied." *In re Application A-16642*, 236 Neb. at 689, 463 N.W.2d at 604.

    The situation here is analogous. Sections 46-288 and 46-289 delineate various factors to be considered by the department in evaluating applications for interbasin appropriations. They, too, can be viewed as mechanisms to be used by the department in determining whether the public interest demands that an interbasin appropriation be denied. Upper Big Blue's contention that the guidelines set out by the statutes are

unconstitutional limitations is not persuasive. Sections 46-288 and 46-289 are the means by which to implement article XV, § 6. Upper Big Blue's second assignment of error is without merit.

Upper Big Blue then asserts, in its third assignment of error, that subsections (4) and (5) of § 46-289 are unconstitutional because they deny to Upper Big Blue the protection of the doctrine of prior appropriation. It is contended that these sections give the department authority to prefer a subsequent intrabasin use over a prior interbasin use, contrary to the doctrine of prior appropriation. Prior appropriation is constitutionally protected by article XV, §§ 4, 5, and 6. *Wasserburger v. Coffee*, 180 Neb. 149, 141 N.W.2d 738 (1966).

Upper Big Blue's contention is based upon the fact that the department, in the order of denial, stated that "[b]ecause Landmark holds a right senior in time to Prairie Bend (II), the later project would not be feasible." Section 46-289(4) provides that the department is to consider "[a]ny reasonably foreseeable future beneficial uses of the water in the basin of origin." The department did so in its evaluation. Initially, it should be noted that a consideration of the foreseeable future beneficial uses clearly fits under the public interest limitation of article XV, § 6. It should also be noted that the doctrine of prior appropriation is not applicable to this situation.

The prior appropriation doctrine does not attach to applications for appropriative rights, but only to actual, vested, appropriative rights. See *In re Applications A-15145, A-15146, A-15147, and A-15148*, 230 Neb. 580, 433 N.W.2d 161 (1988). An application to divert water is only a request for permission to appropriate public waters of the state. *Id.* See, also, Neb. Rev. Stat. § 46-233 (Reissue 1988). Approval of an application merely authorizes the successful applicant to take other measures to perfect the application into an appropriation. § 46-235. After an application is approved, Neb. Rev. Stat. § 46-237 (Reissue 1988) requires that the applicant file a map or plat detailing the proposed project. That section further provides that "no rights shall be deemed to have been acquired until the provisions of this section shall have been complied with."

By filing its applications to divert water, Upper Big Blue received no "water right." See *In re Applications A-15145, A-15146, A-15147, and A-15148, supra.* We have stated that a water right applicant has no property right in a mere application to divert water:

> The granting of the application, in full or in part, is an adjudication which fixes the maximum volume of the appropriation, the rate of diversion, and the priority date. . . . The grant of the appropriation by the department, however, is a conditional right which becomes a perfected and completed appropriation only when the works are completed and the waters put to a beneficial use in compliance with the conditions and limitations of the grant. It confers upon the applicant the prior right to the water against all subsequent applicants during the progress of the work if, and only if, he finally complies with the conditions and limitations of the appropriation as adjudicated by the department.

*North Loup River P. P. & I. Dist. v. Loup River P. P. Dist.*, 162 Neb. 22, 28, 74 N.W.2d 863, 867 (1956).

Upper Big Blue contends that its procedural priority should be entitled to the protection of the doctrine of prior appropriation, or the doctrine becomes a sham. It has been made clear, however, that applications are not what the doctrine was intended to protect. Further, if such a construction were made, the public interest limitation of article XV, § 6, would mean nothing, and the fact that one applicant filed before another would become controlling over public interest concerns. Subsections (4) and (5) of § 46-289 are not unconstitutional because they do not deny Upper Big Blue the protection of the doctrine of prior appropriation. Upper Big Blue's third assignment of error is without merit.

In support of its fourth assignment of error, Upper Big Blue contends that §§ 46-288 and 46-289 are "nothing more than a veiled attempt [by the Legislature] to exercise judicial power contrary to Neb. Const. art. V, §1." Brief for appellant at 35. In this connection, Upper Big Blue argues only that "[s]ince art. XV, §6 is self-executing, no legislation is required to effect its purpose, and 'the form of the action by which its provisions

may be enforced, are matters for judicial determination.' " Brief for appellant at 35. We have determined that article XV, § 6, is not self-executing, and it is, therefore, within the Legislature's province to pass statutes to delineate the public interest. Sections 46-288 and 46-289 do not violate article V, § 1, of the Nebraska Constitution. Upper Big Blue's fourth assignment of error is without merit.

For all the reasons set out above, the applicant has failed to satisfy its burden of demonstrating the questioned statutes to be unconstitutional, and, therefore, its constitutional challenges fail.

As stated above, Upper Big Blue's final assignments of error were based on the presumption that §§ 46-288 and 46-289 would be found unconstitutional. Since we have determined that all the challenged statutes are constitutional, these assignments need not be discussed.

The decision of the director is affirmed in all respects.

AFFIRMED.