549 N.W.2d 112 (1996)
250 Neb. 252
CENTRAL PLATTE NATURAL RESOURCES DISTRICT, Appellant,
v.
CITY OF FREMONT et al., Appellees.
Applications A-16948 through A-16954 of the Central Platte Natural Resources District.
No. S-95-629.
Supreme Court of Nebraska.
June 7, 1996.
*114 James E. Doyle IV, of Cook, Wightman & Doyle, Lexington, for appellant.
Dean Skokan, Fremont City Attorney, for appellee City of Fremont.
Glen A. Murray, Grand Island, for appellees National Audubon Society and Nebraska Chapter of Sierra Club.
WHITE, C.J., and CAPORALE, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.
CAPORALE, Justice.

I. STATEMENT OF CASE
Following an evidential hearing, the director of the Department of Water Resources denied each of the seven applications presented by the applicant-appellant, Central Platte Natural Resources District, for permits allowing it to divert certain waters in order to develop its Prairie Bend II project, as described in part III hereinafter. The district assigns six errors to the director, which may be summarized as claiming (1) that the director's order of denial is contrary to and not supported by competent and relevant evidence and is therefore arbitrary, capricious, and unreasonable, and (2) that in any event, the director did not consider the issues in the proper sequence. We affirm.

II. SCOPE OF REVIEW
In an appeal from the department, an appellate court's review of the director's factual determinations is limited to deciding whether such determinations are supported by competent and relevant evidence and are not arbitrary, capricious, or unreasonable. Central Platte NRD v. State of Wyoming, 245 Neb. 439, 513 N.W.2d 847 (1994); In re Applications A-16027 et al., 242 Neb. 315, 495 N.W.2d 23 (1993) (Landmark Project), modified on other grounds 243 Neb. 419, 499 N.W.2d 548; In re Application A-16642, 236 Neb. 671, 463 N.W.2d 591 (1990) (Long Pine Creek). However, on questions of law, which include the meaning of statutes, a reviewing court is obligated to reach its conclusions independent of the legal determinations made by the director. See Central Platte NRD, supra.

III. BACKGROUND
Through seven applications dealing with various segments of the project, the district seeks to divert waters from the Platte River and a tributary of Prairie Creek in order that it might store the diverted waters and thus replenish the supplies of irrigation waters now being withdrawn from the ground water sources underlying the project lands and to improve water quality for municipal, domestic, and livestock uses through such ground water recharge. The applications would require the withdrawal of waters at various times during the year at the Prairie Diversion Dam near Kearney, Nebraska. The main supply canal would deliver the waters from that point to a main storage reservoir, the North Prairie Reservoir, and to four smaller reservoirs. Waters stored in the North Prairie Reservoir and the smaller reservoirs would then be moved through canals *115 and pipelines to 24 recharge ponds. The reservoirs and storage ponds would leak the stored waters into the ground water aquifer underlying the project area.

IV. ANALYSIS
With that brief background, we turn our attention to the summarized assignments of error and supply such additional facts as the issues require.

1. EVIDENTIAL SUPPORT FOR ORDER
We begin our study of the evidential support for the director's order of denial questioned in the first summarized assignment of error by noting that while one of the applications identifies a "Tributary to Prairie Creek" as the source of the waters sought to be diverted, the director concluded that because the evidence focused "almost exclusively upon the Platte River valley," that application must be denied for a lack of evidential support. In urging that contrary to the director's finding the record does in fact contain competent and relevant evidence concerning the Prairie Creek tributary, the district refers us to the testimony of a hydrologist and to several exhibits. Although it is true that the hydrologist's testimony concerns the subject application individually, it does not provide enough information to assess the application. A review of the exhibits reveals that they concern not the subject application individually, but the entire project as a whole. These circumstances lead us to conclude that notwithstanding the director's somewhat confusing observation concerning the need for a separate denial of the Prairie Creek application, he nonetheless correctly ruled that the applications are to be considered "as a single package."
The district next asserts that the director's order is arbitrary, capricious, or unreasonable because there is no competent and relevant evidence which supports his findings, including the finding that the project would jeopardize the continued existence of the whooping crane, an endangered and threatened species.
A decision is arbitrary when it is made in disregard of the facts or circumstances and without some basis which would lead a reasonable person to the same conclusion. In re Application A-16642, 236 Neb. 671, 463 N.W.2d 591 (1990) (Long Pine Creek). A capricious decision is one guided by fancy rather than by judgment or settled purpose; such a decision is apt to change suddenly; it is freakish, whimsical, humorsome. Id. The term "unreasonable" can be applied to an administrative decision only if the evidence presented leaves no room for differences of opinion among reasonable minds. Id.
The evidence demonstrates that the Department of Water Resources requested formal consultation regarding these applications with the Nebraska Game and Parks Commission. The consultation was devoted to evaluating the effects of the project on 11 endangered and threatened species, including the whooping crane. The commission thereafter issued an opinion that "[t]he project will not jeopardize the continued existence of the whooping crane [assuming] that the exact site of the diversion structure will be determined so as to ensure that whooping crane roosting habitat will not be adversely affected." The testimony of one of the authors of the foregoing opinion further made clear that the conclusion that the project would not jeopardize the whooping crane was based on the assumption that the diversion structure for the project would not be located in any whooping crane roosting habitat.
The record establishes that there were 20 confirmed sightings of whooping cranes in the Platte River Valley from April 4, 1943, through April 4, 1988, and the director noted a biologist had personally observed whooping cranes in the immediate vicinity of the Prairie Bend diversion dam. The director further observed that the proposed diversion dam is in the same location as crane-watching blinds operated by the U.S. Fish and Wildlife Service. Additionally, a letter from the acting field supervisor of the Nebraska-Kansas Field Office of the U.S. Fish and Wildlife Service to the acting regional director of the Bureau of Reclamation stated in part:
A remaining concern, which only recently came to light, is the resolution of the proposed location for the Prairie Diversion *116 Dam. This location, which has been discussed with members of your Grand Island staff, needs further evaluation because of recent whooping crane sightings in the vicinity and land acquisition by the State of Wyoming. In November of 1986, three whooping cranes roosted in the Platte River channel about 1,800 feet upstream of the proposed dam site. Furthermore, the dam currently would be sited within the property recently purchased by the Wyoming Water Development Commission for the purpose of offsetting whooping crane roosting habitat impacts attributable to the proposed Deer Creek project. For these reasons, we believe the diversion dam as proposed may need to be relocated.
The director further noted that although the water depth for whooping crane roosting sites should be less than 12 inches, a hydrologist testified that the depth of the waters which would pond behind the dam structure would be 4 feet and that upstream approximately one-half mile, the depth would be 1 to 2 feet. In 1978, the U.S. Department of the Interior designated a 3-mile-wide, 58-milelong reach from Lexington to Denman, Nebraska, "whooping crane critical habitat." This area includes the proposed damsite.
Although others might weigh this evidence differently, under that state of the record, it cannot be said that the director's finding that the proposed project would jeopardize the endangered whooping crane is not supported by competent and relevant evidence. Because the analysis which follows in part IV(2) hereof establishes that this evidentially supported finding in and of itself makes the director's order a reasoned one and thus not one which fairly can be characterized as arbitrary, capricious, or unreasonable, we must conclude that the first summarized assignment of error is without merit.

2. SEQUENCE OF CONSIDERATION
In the second summarized assignment of error, the district contends that the director erred in failing to consider the issues in the proper sequence. The district first argues that the Nebraska Constitution and Neb.Rev. Stat. § 46-235 (Reissue 1993) "plainly require, as a first step in the analysis of an application, the determination of whether there is unappropriated waters." Brief for appellant at 13. According to the district, as the director made no finding concerning the presence or absence of unappropriated waters, he could not have reached the constitutionally required consideration of the public interest, and the director's order must, on that basis alone, be reversed.
Even if we assume for the purposes of this analysis that the director's order does not implicitly find the existence of unappropriated waters, it must be noted that Neb. Const. art. XV, § 6, provides, in part, that "[t]he right to divert unappropriated waters of every natural stream for beneficial use shall never be denied except when such denial is demanded by the public interest." Section 46-235(1) implements that constitutional provision as follows:
For applications other than those to appropriate public waters for induced ground water recharge, if there is unappropriated water in the source of supply named in the application, if such application and appropriation when perfected are not otherwise detrimental to the public welfare, and if denial of the application is not demanded by the public interest, the Department of Water Resources shall approve the application....
It is clear that neither article XV, § 6, nor § 46-235(1) requires that the director engage in a particular sequential consideration of the issues presented by an application. The constitutional right to divert waters is not absolute; only unappropriated waters are subject to that right and then only if the public interest does not demand that the application to divert such waters be denied. Thus, if the director determines that the public interest demands that an application be denied, it matters not whether the waters sought to be diverted were or were not appropriated. In either case, the director is empowered to deny the application. Neb.Rev.Stat. § 46-234 (Reissue 1993) ("[i]f there is no unappropriated water in the source of supply ... the Department of Water Resources may refuse such application"); § 46-235.
*117 The district's second argument in regard to this summarized assignment of error is that the director made no finding that the public interest demanded denial of the applications. But that is simply not so; as set forth in part IV(1) above, the director specifically and reasonably found that the project will jeopardize the continued existence of the endangered and threatened whooping crane.
The question is whether this finding satisfies the constitutional and statutory requirement that the denial of the applications be "demanded by the public interest." In other words, the crucial inquiry at this point becomes what is meant by the phrase "public interest" and the term "demanded." Neither expression is defined by the Constitution. And while the Legislature has provided various factors for the director to take into consideration in determining whether the public interest demands that the right to appropriate waters should be denied in the context of instream appropriations and interbasin transfers, it has not done so for the type of appropriation involved here. Compare § 46-235(1) with Neb.Rev.Stat. §§ 46-289 and 46-2,116 (Reissue 1993).
Nonetheless, the Legislature has given considerable guidance as to what is in the public interest so far as the appropriation of waters generally is concerned.
Neb.Rev.Stat. § 37-432 (Reissue 1993) provides, in part:
(1) That it is the policy of this state to conserve species of wildlife for human enjoyment, for scientific purposes, and to insure their perpetuation as viable components of their ecosystems;
(2) That species of wildlife and wild plants normally occurring within this state which may be found to be threatened or endangered within this state shall be accorded such protection as is necessary to maintain and enhance their numbers;
(3) That this state shall assist in the protection of species of wildlife and wild plants which are determined to be threatened or endangered elsewhere pursuant to the Endangered Species Act by prohibiting the taking, possession, transportation, exportation from this state, processing, sale or offer for sale, or shipment within this state of such endangered species and by carefully regulating such activities with regard to such threatened species.
Moreover, Neb.Rev.Stat. § 37-435(3) (Reissue 1993) provides, in pertinent part:
All other state agencies shall, in consultation with and with the assistance of the commission, utilize their authorities in furtherance of the purposes of the [Nongame and Endangered Species Conservation] act by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 37-434 and by taking such action necessary to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of such endangered or threatened species or result in the destruction or modification of habitat of such species which is determined by the commission to be critical. For purposes of this subsection, state agency shall mean any department, agency, board, bureau, or commission of the state or any corporation whose primary function is to act as, and while acting as, an instrumentality or agency of the state, except that state agency shall not include a natural resources district or any other political subdivision.
In upholding the constitutionality of § 37-435(3) against the claim of the Upper Big Blue Natural Resources District that the statute impermissibly limited or altered the substantive right to divert unappropriated waters for irrigation purposes, we recognized that article XV, § 6, was not self-executing. See In re Applications A-16027 et al., 243 Neb. 419, 499 N.W.2d 548 (1993) (Landmark Project). Determining that our task in that case was to determine whether the challenged statute permissibly implemented and effectuated the policies found in the relevant constitutional provisions, specifically the language found in article XV, § 6, we wrote:
In the legislative declaration to the Nongame and Endangered Species Conservation Act (NESCA), of which § 37-435(3) is a part, the Legislature stated that "nongame, threatened, and endangered species have need of special protection and ... it *118 is in the public interest to preserve, protect, perpetuate, and enhance such species of this state through preservation of a satisfactory environment and an ecological balance." (Emphasis supplied.) ... The stated legislative intent behind NESCA is to conserve wildlife species for human enjoyment, for scientific purposes, and to ensure their perpetuation as viable components of their ecosystems, as well as to assist in the protection of endangered species pursuant to the federal Endangered Species Act....
... Section 37-435(3) provides for the establishment and implementation of conservation programs to effectuate the protection of endangered species as a public interest. The Legislature's determination of a public interest and the corresponding implementing statutes are not unreasonable, arbitrary, discriminatory, or confiscatory. The limitations that § 37-435(3) places on the diversion of unappropriated waters permissibly effectuate the provisions of Neb. Const. art. XV, §§ 4, 5, and 6.
(Emphasis in original.) In re Applications A-16027 et al., 243 Neb. at 424, 499 N.W.2d at 552.
We have held that while a legislature may not, under the guise of regulating in the public interest, impose conditions which are on their face unreasonable, arbitrary, discriminatory, or confiscatory, whether legislation is in the public interest is generally a question for legislative determination. In re Applications A-16027 et al., supra. Given that rule and our determination that the Legislature acted constitutionally in declaring the protection of endangered or threatened species to be in the public interest, the question becomes whether this public interest demanded that the district's applications be denied.
As the Department of Water Resources is a state agency within the meaning of the Nongame and Endangered Species Conservation Act, § 37-435(3), the issuance of a permit through its director would qualify as an "action" taken by a state agency. The director therefore may not issue permits which would jeopardize the continued existence of an endangered or threatened species, or result in the destruction or modification of their habitat. Little Blue N.R.D. v. Lower Platte North N.R.D., 210 Neb. 862, 317 N.W.2d 726 (1982), overruled in part on other grounds, In re Applications A-16027 et al., 242 Neb. 315, 495 N.W.2d 23 (1993) (Landmark Project).
Thus, we need not at this time formulate a prescriptive definition of the term "demanded," for the only way to satisfy the public interest, as declared in § 37-435(3), is by denying permits to appropriate waters when doing so would jeopardize the continued existence of an endangered or threatened species. Consequently, the director's evidentially supported finding that the district's proposed project would jeopardize the continued existence of the endangered whooping crane demanded that the district's applications be denied.
That being so, the second summarized assignment of error is likewise without merit.

V. JUDGMENT
For the foregoing reasons, the director's order is, as first noted in part I above, affirmed.
AFFIRMED.
FAHRNBRUCH, J., not participating.
WRIGHT, Justice, dissenting.
I respectfully dissent from the decision of the majority. The Central Platte Natural Resources District filed applications for permits to appropriate and store water for its Prairie Bend II project. In my opinion, the decision of the director of the Department of Water Resources to deny the applications was arbitrary and was not supported by the evidence.
As a part of his order, the director considered "[w]hether the Project, if approved, would jeopardize nongame endangered species or their habitat (§ 37-435)." The director concluded:
Nongame and Endangered Species
The Project will jeopardize the continued existence of the endangered whooping *119 crane. Provided the Project is operated so as to bypass flows specified by the Commission it will not jeopardize the interior least tern....
Whooping Cranes
Problematic is the Commission's statement that the Project would not jeopardize whooping cranes. According to the Biological Opinion, the nonjeopardy determination assumes the Project diversion dam structure will be located so as to insure that roosting habitat will not be adversely affected (E16,2). During examination Ross Lock, a staff biologist assigned to the Commission's Lincoln office and author of the Biological Opinion, verified that assumption (T2889).
Earlier Ken Strom, a field biologist who resides nearby, testified the diversion dam would be situated on land with crane-watching blinds operated by the U.S. Fish and Wildlife Service (T1269). He said whooping cranes have been sighted at the proposed dam site (T1228, T1271-1272).
More completely undermining Lock's assumption, however, is a letter (E103) to the Acting Regional Director of the Bureau of Reclamation from the Acting Field Supervisor of the Nebraska-Kansas Field Office of the U.S. Fish and Wildlife Service. In regard to the location of the Prairie Bend Diversion Dam, it states:
This location ... needs further evaluation because of recent whooping crane sightings in the vicinity and land acquisition by the State of Wyoming. In November of 1986, three whooping cranes roosted in the Platte River channel about 1,800 feet upstream of the proposed dam site. Furthermore, the dam currently would be sited within the property recently purchased by the Wyoming Water Development Commission for the purpose of offsetting whooping crane roosting habitat impacts attributable to the proposed Deer Creek project. For these reasons, we believe the diversion dam as proposed may need to be relocated.
As a technical matter roosting site water depth should be less than 12 inches (E103,II-2). The Project diversion dam would be placed across the entire river channel and is expected to back up water to a depth of four feet during normal operations. Extending a mile upstream, the depth might be one to two feet (T587-588). Given these facts, when it comes to whooping cranes the Commission's Biological Opinion is not reliable.
The director rejected the findings of the commission based upon the above conclusions and determined that the applications endangered the whooping crane. The majority finds that the director's conclusion that the proposed project would jeopardize the endangered whooping crane was supported by competent and relevant evidence. I disagree.
The majority cited the following evidence as support for denial of the applications: (1) There were 20 confirmed sightings of whooping cranes in the Platte River Valley from April 4, 1943, through April 4, 1988, and (2) a biologist had personally observed whooping cranes in the immediate vicinity of the Prairie Bend diversion dam. The director had also noted that the proposed diversion dam was located near crane-watching blinds operated by the U.S. Fish and Wildlife Service. Additionally, the director referred to the April 11, 1989, letter from the acting field supervisor of the Nebraska-Kansas Field Office of the U.S. Fish and Wildlife Service to the acting regional director of the Bureau of Reclamation, which stated in part:
A remaining concern, which only recently came to light, is the resolution of the proposed location for the Prairie Diversion Dam. This location, which has been discussed with members of your Grand Island staff, needs further evaluation because of recent whooping crane sightings in the vicinity and land acquisition by the State of Wyoming. In November of 1986, three whooping cranes roosted in the Platte River channel about 1,800 feet upstream of the proposed dam site. Furthermore, the dam currently would be sited within the property recently purchased by the Wyoming Water Development Commission for the purpose of offsetting whooping crane roosting habitat impacts attributable to the proposed Deer Creek project. For these reasons, we believe the diversion dam as *120 proposed may need to be relocated. However, this issue will be addressed in the advanced planning phase of the project and will be resolved at that time.
The evidence is insufficient to support the director's order for the following reasons: The director's statement concerning the upstream water level backup caused by the diversion dam is erroneous. Determination of the depth of water at any point upstream from the damsite is based upon the water level at the damsite. Contrary to the director's order, the record does not state that the diversion dam will back up water to a depth of 4 feet "during normal operations." Duane Woodward, an expert witness whose testimony was cited by the director as the basis for this conclusion, testified that the maximum height that the water could back up at the damsite would be 4 feet and that it would do so only under highly unusual conditions.
And then if you look up by the embankments, they show what the maximum water level would be with a hundred-year flood, and that's elevation 2,126. And so during most normal operations, the water level would be approximatelysomewhere between thatin that four-feet range. It would be less than that four-feet range. That's the difference of the 2,126 and the 2,122, is four feet. So the deepest the water would be over the spillway crest would be four feet.
(Emphasis supplied.) Thus, 4 feet is the absolute maximum water level the dam could ever produce, and such levels would occur only in a 100-year flood cycle.
The director stated that given this 4-foot figure, "[e]xtending a mile upstream, the depth might be one to two feet." This conclusion is also erroneous. Woodward testified regarding elevation rates as follows:
So if you're moving upstream from the diversion dam, the elevation gets higher and higher.
Q[.] And what's the interplay between the increase in the elevation of the river bed and the depth of water that you're seeing in thethat the dam creates?
A[.] Well, as you move upstream, the depth will get less and less. So if there's four foot of depth at the dam, then as you move up, say, a half-mile or so, you might only have two feet or one foot.
The director used this testimony to support his claim that 1 mile from the dam, the water level would be 1 or 2 feet. However, the testimony at the hearing was that the water level would be 1 to 2 feet as near as one-half mile from the proposed damsite.
In fact, Woodward testified that the typical dropoff in elevation on the Platte River was 6 feet per mile. Therefore, if the water level at the dam was the maximum level of 4 feet, the water level at one-half mile from the damsite would be reduced by 3 feet, resulting in a maximum water level of 1 foot. Under normal operating conditions, the backup water level at the dam would be less than 4 feet. Applying Woodward's elevation dropoff analysis, the 3-foot dropoff from the dam would place upstream water levels at less than 1 foot. According to the standards cited by the director, 1 foot or less is an ideal water level condition for whooping crane roosting.
Regarding factual determinations, an appellate court's review is limited to deciding whether the agency's determination is supported by competent and relevant evidence and is not arbitrary, capricious, or unreasonable. Central Platte NRD v. State of Wyoming, 245 Neb. 439, 513 N.W.2d 847 (1994). A decision is arbitrary when it is made in disregard of the facts and without some basis which would lead a reasonable person to the same conclusion. In re Application A-16642, 236 Neb. 671, 463 N.W.2d 591 (1990). The director's erroneous statement of the evidence and his erroneous calculations regarding the water level formed an arbitrary basis for his rejection of the commission's report.
As a further basis for rejecting the commission's report, the director referred to the April 11, 1989, letter from the acting field supervisor of the Nebraska-Kansas Field Office of the U.S. Fish and Wildlife Service. The director claimed this letter undermined the commission's determination that the proposed site would not jeopardize whooping *121 cranes. In my opinion, the director arbitrarily used this letter to reject the commission's report. The field supervisor's conclusion in the letter was that he agreed with the Bureau of Reclamation's finding that "the currently proposed project would not likely adversely affect whooping crane designated critical habitat, [or] whooping crane roosting habitat morphology."
The director ignored this statement and instead noted the letter's passing concern about the precise location of the diversion dam. As set forth above, the letter concludes that "this issue will be addressed in the advanced planning phase of the project and will be resolved at that time." The letter does not state that relocation of the proposed damsite is required to protect whooping crane roosting habitat. It merely states that the reported whooping crane sighting created a basis for concern about the precise location of the dam. The letter clearly anticipates that the project will go forward and that any risk presented to whooping crane habitat would be investigated further and would be addressed in later phases of the project development. There is no evidence that any further investigation or adjustment occurred, and the director does not cite to evidence in the record which suggests that these concerns were not addressed during later project planning stages. There is no evidence that the U.S. Fish and Wildlife Service or the Bureau of Reclamation ever again expressed any concerns about the proposed placement of the diversion dam.
The conclusion that the director makes from the letter is not supported by other evidence relied upon by the director. The letter was written under the assumption that the whooping cranes roosted at the location of the sighting. However, the testimony of Ken Strom, the biologist who was present at the whooping crane sighting, does not establish that the whooping cranes roosted at the location of the sighting. Strom testified that he saw the birds resting on or flying over the river at a spot which he indicated on a map was approximately one-half mile from the proposed damsite. Strom stated that although he watched the birds for approximately 30 minutes, he never saw them roosting on the river at that spot. He testified that he simply assumed they had roosted there. In my opinion, this is not a sufficient evidentiary basis for making a claim that this sighting "completely undermin[es]" the commission's determination that the proposed damsite will not disrupt whooping crane roosting habitat, and did not support the director's rejection of the commission's report. A sighting of three whooping cranes approximately one-half mile from the proposed damsite cannot be the basis for a denial of the applications in view of our Constitution's strong mandate that "[t]he right to divert unappropriated waters of every natural stream for beneficial use shall never be denied except when such denial is demanded by the public interest." See Neb. Const. art. XV, § 6.
Finally, the director concludes that "[f]rom a public interest perspective, denial of the applications should be based upon an absence of established need to augment existing water supplies now obtained from local ground water sources." In my opinion, this conclusion does not conform to the law. The law does not permit the director to determine that the public interest demands that Central Platte's applications be denied on the basis of the director's opinion about the necessity of the proposed project.
WHITE, Chief Justice, concurring.
I write separately to address issues raised by the dissent and to comment on the appropriate standard of review of administrative decisions.
The Legislature created the Department of Water Resources (DWR) to act as an arm of the executive branch, with the DWR occasionally acting in a quasi-judicial capacity. Ours is the first judicial review of DWR decisions, and accordingly, we proceed mindful of the fact that the DWR is not bound by the rules of evidence, civil procedure, or many of the other rules governing proceedings in the judicial branch.
A review using the "arbitrary and capricious" standard requires considerable deference to the judgment and expertise of the agency. A decision is arbitrary and capricious *122 if the agency has relied on factors which [the legislature] has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.
Motor Vehicle Mfrs. Assn. v. State Farm Mut., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866-67, 77 L.Ed.2d 443 (1983). This description does not apply to the director's decision. A decision is not arbitrary and capricious merely because it ascribes greater weight to some pieces of evidence, so long as some evidence does support the decision.
The dissent points to evidence from which the director has drawn conclusions, arguing that those conclusions respond to unlikely environmental scenarios. The conclusions are not without support, however, even if they derive from the worst-case scenarios presented by the experts who testified. Rather, the conclusions serve to err on the side of caution to protect a threatened species that will be harmed if the worst of the presented scenarios comes to pass.
Erring on the side of caution is not the same as "in disregard of the facts and without some basis which would lead a reasonable person to the same conclusion." In insinuating that the director should have disregarded the worst-case scenario and based his conclusions on different facts that the dissent considers to be weightier or more important, the dissent conducts its own finding of factbut finding facts is not within our province in this case. This court is not a super regulatory body to review the policy or wisdom reflected in determinations made by the DWR as to such issues.
It appears that the DWR has acted within its jurisdiction, and there is some competent evidence to sustain its findings and order. As such, this court cannot interject itself into the realm of the executive's discretion as to what action should be taken to avert a threat to an endangered species.