STEPHEN R. STYSKAL, D.D.S., APPELLANT, V. GREGG F. WRIGHT,
M.D., M.ED., AND DEPARTMENT OF HEALTH, STATE OF
NEBRASKA, APPELLEES.

519 N.W.2d 543

Filed July 29, 1994.   No. S-91-906.

Steven E. Achelpohl and John W. Steele, of Schumacher &
Achelpohl, for appellant.

Don Stenberg, Attorney General, and Melanie J.
Whittamore-Mantzios for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE,
FAHRNBRUCH, and LANPHIER, JJ., and GRANT, J., Retired.

GRANT, J., Retired.

A disciplinary action was filed before the director of the
State Department of Health, Gregg F. Wright, M.D., against
Stephen R. Styskal, D.D.S., by the Attorney General of
Nebraska. The petition alleged that Styskal had engaged in
grossly immoral, dishonorable conduct showing a lack of

fitness to practice dentistry in Nebraska, in violation of Neb. Rev. Stat. § 71-147(2) (Reissue 1990); that Styskal had practiced dentistry beyond its authorized scope, in violation of § 71-147(5)(b); and that Styskal had engaged in unprofessional conduct, in violation of § 71-147(10).

After a hearing before an examiner designated by the director, the director issued his order finding that Styskal had violated each of the statutory sections. The director revoked Styskal's license to practice dentistry in Nebraska.

Styskal timely appealed from the director's decision to the district court for Lancaster County pursuant to Neb. Rev. Stat. § 84-917 (Cum. Supp. 1992) by filing a petition in which Styskal was plaintiff, and the director of the State Department of Health and the State Department of Health were defendants.

Where the proceedings for review of an administrative hearing are initiated in the district court after July 1, 1989, the review will be conducted by the district court "without a jury de novo on the record of the agency" as required by § 84-917(5)(a). After its review, the district court, in a 12-page opinion, stated that the court believed that the account of the State's witnesses was accurate, and the court found, by clear and convincing evidence, that Styskal had violated each of the statutes alleged in the proceedings against him to have been violated. The district court modified the director's order and issued its order suspending Styskal's license to practice dentistry for 2 years from June 4, 1991, with the further requirement that after that time, Styskal was to be on probation for the practice of dentistry and subject to certain conditions.

Styskal timely appealed to the Nebraska Court of Appeals. We removed the case to this court under the authority of Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 1992) in order to regulate the caseloads of the Nebraska appellate courts and because Styskal raised the question of the constitutionality of certain Nebraska statutes. In his appeal, Styskal assigns three errors. He contends that the district court erred as a matter of law in interpreting Neb. Rev. Stat. § 71-183(6) (Reissue 1990) to limit dental diagnosis and treatment to the areas of the neck and above. He then contends in his second assignment of error that "[t]he District Court's erroneous legal interpretation with

respect to the allowable scope of dentistry impermissibly infected its determination of the facts." Finally, Styskal contends that "[t]he dentistry statutes under which [he] was disciplined are unconstitutionally overbroad and vague on their face and as applied in this case." We note, in connection with his second assignment of error, that Styskal in his brief specifically states that he does not raise the question of sufficiency of the evidence. We agree that the evidence is sufficient to support the judgment, and for the reasons hereinafter stated, we do not reach the other questions presented. We affirm.

The record before us shows the facts hereinafter set out. Styskal was licensed to practice dentistry in Nebraska in 1979. He practiced dentistry in Grand Island, Nebraska, after that time until his license to practice dentistry was suspended.

The State's disciplinary action against Styskal was based on his conduct with a female patient, Elpidia Zavala, on February 17, 1990. Zavala is from Mexico and had lived in the United States since 1985. On December 19, 1988, she was in an automobile accident in Grand Island in which she injured her jaw, chest, neck, and back. After the accident, Zavala was examined at St. Francis Medical Center in Grand Island. X rays of her skull, chest, and cervical spine were taken. Zavala later consulted a chiropractor in Grand Island; an orthopedic surgeon in Hastings, Nebraska; and a dentist in Grand Island, Dr. Gerald Murphy. All of these consultations were before Zavala saw Styskal. The orthopedic surgeon and the chiropractor evaluated the x rays taken at St. Francis Medical Center. On January 31, 1989, Dr. Murphy took and evaluated x rays of Zavala's jaw and did a thorough clinical dental examination. No examining health professional found any broken bones. The general conclusion was that Zavala had suffered a cervical strain with some associated injury.

Dr. Murphy's opinion was that Zavala had suffered a "traumatically induced internal derangement of the temporomandibular joint with a muscle dysfunction." Dr. Murphy testified that as a dentist, he specialized in "cranial mandibular disorders," which he defined as "a branch of dentistry that deals with the musculoskeletal interrelationship of the jaw to the cranium and the cranium to the cervical spine."

Dr. Murphy testified that he was a fellow in the American Academy of Head, Neck, and Facial Pain, which is an association formed by health care professionals, including dentists, having an interest in that specialized field.

Dr. Murphy further testified that an injury of the type Zavala suffered was first referred to as TMJ (temporomandibular joint disorder), but that the correct term is temporomandibular disorder or craniomandibular disorder. Throughout the hearing, the condition was usually referred to as "TMD," and we will, as did the learned district judge on appeal, so refer to the condition in this opinion. No party in this case contends that Dr. Murphy is not an expert in the field of TMD.

Dr. Murphy explained there is a direct biomechanical and functional interrelationship between the craniomandibular and the craniocervical complex. In order to more easily determine the thrust of Dr. Murphy's testimony, we note the following definitions from the Sloane-Dorland Annotated Medical-Legal Dictionary (1987): "Temporomandibular" is defined as " 'pertaining to the temporal bone and the mandible.' " *Id.* at 696. (The temporal bone is one of the two irregular bones forming part of the lateral surfaces and base of the skull.) "Cranium" means "the skeleton of the head, variously construed as including all of the bones of the head . . . except the mandible." *Id.* at 171. "Mandible" or "mandibula" means "the bone of the lower jaw," *id.* at 431, and "cervical" means "pertaining to the neck," *id.* at 132.

Dr. Murphy testified that because of the interrelation of the bones and muscles of the head, neck, and upper part of the body, it was within proper dental practice to check the various muscles in that part of the body to determine if a relatively remote muscle might be causing facial pain in a patient's jaw.

The American Academy of Head, Neck, and Facial Pain recommended that various muscle palpations should be performed on, among others, the trapezius muscle, the pectoralis muscle, and the sternalis muscle. These palpations may lead to the discovery of a "trigger point," a term which Dr. Murphy defined as an area within a muscle where the muscle is dysfunctional. Dr. Murphy explained as an example that pressure on a trigger point in the trapezius muscle, the large

muscle in the shoulder, could cause pain in the side of a patient's head. In that situation, treatment of the trigger point in the muscle might relieve the pain in the side of the head.

Dr. Murphy's position on the effect of muscle dysfunction in other parts of the body causing pain in a dental patient's jaw was summarized in an article he had written entitled "Myofascial Trigger Points." This article was received as exhibit 9 and stated, in part:

> Although some of the pain associated with craniomandibular disorders may be arthralgic [pain in a joint], in the vast majority of cases it is myalgic [pain in a muscle]. Such pain is often the direct result of muscle spasm, trigger points, or a combination of the two. To correct the pain pattern, you must correct the muscle dysfunction.

Styskal's contention in response to the allegations that he had engaged in immoral, dishonorable, and unprofessional conduct in his treatment of Zavala was that he was only attempting to determine what was causing the pain in her jaw in order that the pain could be relieved. In other words, Styskal's position is that his actions in this matter with regard to Zavala were proper and professional and within the scope of the practice of dentistry in that he was applying procedures of the type described by Dr. Murphy in order to diagnose and treat TMD in his patient's jaw.

Styskal first saw Zavala as a patient on February 15, 1989. Zavala testified that she told Styskal that she had seen Dr. Murphy, that Dr. Murphy told her she had a TMD and needed a "plate," and that she went to Styskal to get a plate. In his office, she completed a patient questionnaire with the aid of the dental assistant. Styskal was informed that Zavala had been in an automobile accident and had seen a medical doctor, a chiropractor, and a dentist, Dr. Murphy. He then examined Zavala. Present in his examining room at this time were Zavala; her husband; Connie Yarina, a dental assistant; and Styskal. Styskal testified that his examination included "palpation of trigger points, palpation of all those muscles that I talked about, the shoulder, neck. . . . I had Mrs. Zavala raise the back of her sweater so that I could palpate those muscles, the

trapezius muscle, and we checked her spine alignment." Zavala did not want further x rays because Dr. Murphy had already taken them. Styskal then said he could talk to Dr. Murphy and that he would also consult the chiropractor who had been treating Zavala.

Styskal next saw Zavala on Friday, February 17. Apparently, Zavala's husband first set up the time for 1:30 p.m. He then called back and changed the time to 3:30 p.m., because Zavala was working until 3 o'clock. When Zavala returned to her home after work, she told her husband that she had an appointment with the chiropractor. Styskal's office was so informed. It was then agreed that Zavala could come to Styskal's office when she finished her visit to the chiropractor. The appointment had been made for a Friday afternoon, which was a time when Styskal's dental assistant was ordinarily off work. The assistant waited in the office, however, until approximately 5 p.m. so that she could assist in the examination, but left the office before the Zavalas appeared shortly after 5 p.m.

Styskal took Zavala and her husband into the examining room. The husband remained in the room throughout the examination. Styskal told them that he had talked to Dr. Murphy and the chiropractor about her condition. He showed them a chart of the bone structure and spinal cord area in the back of the body, as he had done at the first consultation. Styskal again told the husband that he wanted to show the husband where Zavala's problems were and then the husband could do something to alleviate Zavala's pain by giving her physical therapy in the form of massage.

Styskal then gave Zavala a massage on her back. Zavala testified that Styskal pulled her blouse up and massaged her upper back and lower back with his whole palm and with his fingertips and that he then pulled her pants and underpants down to a point about the middle of her buttocks. Zavala then testified that Styskal "stuck his finger in my rear end."

After these incidents, Styskal told her to sit in the dental chair, where he checked her jaw again, and asked Zavala where her pain was. When she mentioned pain in her chest, Styskal pulled her sweater up and began touching her chest. Zavala

testified that "he pulled up my right cup of my bra," exposing her bare breast. Zavala testified that "I was uncomfortable when he pulled down my pants . . . but when he touch my breast, my bare breast, I had no doubt of his intentions and I got so scared I was afraid."

Zavala then testified that after this, Styskal said, "That's all I can do for you guys. I can't do anything," and then gave her two pats on the stomach and said, "I don't take any litigation cases. I refer you to Dr. Murphy."

Zavala's husband testified that he was with his wife at all times during Styskal's examination of her on February 17. He testified that Styskal used the same chart as on the 15th and massaged Zavala's back while telling him how he could make her feel better. Zavala's husband then testified that Styskal then began massaging farther down "to the lower part of the tailbone," and he saw Styskal's "two fingers stretching the elastic on her pants and from there I turned my head." When asked why he turned his head, the husband testified: "Because I was stunned. I couldn't believe it. I was, you know, I was scared . . . I didn't know what to do, you know." When asked why he was scared, he testified, "I felt helpless okay. I just couldn't believe what was going on."

After this, Zavala was directed by Styskal to get back in the dental chair, where he began touching her on the chest over her clothing and asking where her pain was. Zavala's husband testified that as Styskal "kept on jabbing," his wife's shirt was up, and he saw the side of his wife's breast. Zavala's husband testified that Styskal then stated he was done, that he thought a plate would be better, and that he "doesn't work with people with allegations [sic] since it was a car accident," but that if the Zavalas wanted another dentist, he would volunteer his information.

The charge for the first visit to Styskal had been paid, and after the second visit was concluded, he told the Zavalas that there was no charge for the second visit.

In his testimony, Styskal generally testified to his knowledge of TMD and his method of treating it. He testified that he knew of trigger points and how pain could be referred from a muscle to a joint in the head or jaw. He also testified that during the

two visits of the Zavalas, he had used a chart to explain to Zavala's husband how he might alleviate Zavala's pain by massage. Styskal denied that he ever touched Zavala's buttocks or that he ever raised her sweater for any examination. In connection with the examination of her back, Styskal testified that Zavala had raised her sweater and that he had lifted the sweater "an inch or two at the very most . . . just to show the spine and the fact that it was straight." In connection with the examination of Zavala's chest, he stated that she had lifted her sweater to "about mid-chest, which was sufficient." Styskal then testified, "I might have lifted it up a little bit more, but she lifted it up." Styskal further testified that he did not believe he had moved her bra at all, and when asked if he had moved the bra strap between her breasts, he replied: "You know, when you're palpating that sternalis [muscle], you will run in contact with that and touch that, but that's it."

Styskal testified he was checking the patient's chest bone "for the sternalis muscle, the trigger point, it's associated." When asked if he was checking for cracked ribs or a cracked sternum, he replied:

> That you do in conjunction with the stern—you know, you're just—when you do that you're looking for a hot muscle. She might have had a muscle in spasm, she might have had a trigger point, whatever, and I, you know, in the process of it it's hard for me to tell whether it's cracked or broken or something of that nature and you refer them to a physician for that. But I just gave her choices of what possibly could be there.

When asked if he had recommended to Zavala that she wear an Ace bandage, he replied:

> I said that may be what treatment option is available. I was a corpsman in the Navy and when you found some stuff like that you had to wrap them in Ace wrap. There isn't a lot can be done for a cracked—and I was just surmising that might be a problem and that might be some way they resolve it, I was just trying to be helpful to her.

Other than testimony as to the facts of Zavala's consultations with Styskal, the record shows that four Nebraska-licensed dentists testified, in addition to Styskal. Dr. Murphy testified,

as set out above, as to TMD and the diagnosis and treatment of TMD problems and that such problems could properly be treated by a dentist. He testified that there was no dental reason to touch a female patient's breast and no dental reason for a dentist to put his hand in a patient's pants.

Dr. Michael Owens, a practicing dentist and a classmate of Styskal in dental school, testified that a dentist who palpated the sternalis muscle or the trapezius muscle in a TMD patient would be acting within the scope of dentistry. He further testified that there is no need for a dentist to go below a patient's pant line, stating that a dentist might do so "inadvertently, but not on purpose, no." He also testified that it would be unprofessional conduct for a dentist to touch a patient's breast "on purpose" and that he would not know why a dentist would need to expose a female patient's breast.

Dr. Thomas Cavel, a dentist in private practice and the chairman of the department of operative dentistry at Creighton University, testified that he had taken postgraduate courses in the treatment of TMD. He further testified that he did not subscribe to the trigger-point theory and that in diagnosing TMD, he would palpate the muscles of mastication looking for tenderness and "do occlusal records, maxillary and mandibular records." He testified that in doing a TMD diagnosis, he would not touch a patient's back or chest. He further testified that it would be grossly dishonorable to lift a patient's shirt in front or in back and that "I don't think there's any reason to be palpating the breast or back or buttocks of any patient."

Dr. Royal Norman testified that he was a licensed dentist. He practiced dentistry in private practice and taught at Creighton University dental school. Dr. Norman testified that trigger-point therapy was not taught at Creighton dental school in 1990, but that it would be in the future, although not with reference to areas below the neck because "it's not our territory, it's not where we come from, and what we are licensed for." He testified that "all of the objectives are pointed toward head and neck only for TMD, and that's the way I feel it should be." He further testified that it was improper and beyond the authorized scope of dentistry for a dentist to lift a patient's shirt in back or front or to lower a patient's pants.

Styskal himself testified that there was no reason for a dentist to put his hands in a patient's pants or to expose a patient's breast while doing a TMD examination.

After consideration of the facts set out above, the director found that Styskal had "touched the bare breast, back, and buttocks of his patient, Elpidia Zavala, and inserted his hand inside her underpants," and concluded that Styskal had violated the provisions of § 71-147(2), (5)(b), and (10).

On appeal to the district court, that court found that the account of the State's witness was accurate and that Styskal had engaged in grossly immoral and dishonorable conduct as prohibited by § 71-147(2), had practiced dentistry beyond its authorized scope in violation of § 71-147(5)(b), and had engaged in unprofessional conduct in violation of § 71-147(10).

As stated above, the review of the district court was de novo on the record, and the district court in its findings agreed with the director. The decision of the district court after review under the Administrative Procedure Act may be appealed to the Nebraska Court of Appeals, and in cases where the petition instituting review was filed in the district court after July 1, 1989, as in this case, "[t]he judgment rendered or final order made by the district court may be reversed, vacated, or modified for errors appearing on the record." Neb. Rev. Stat. § 84-918(3) (Cum. Supp. 1992).

We have carefully examined the voluminous record before us, and we find no errors in the record. The evidence adduced before the director fully supports the conclusion that Styskal has violated the provisions of § 71-147 in the particulars found.

With regard to Styskal's contention that § 71-147(2), which prohibits "grossly immoral or dishonorable conduct"; § 71-147(5)(b), which prohibits the practice of dentistry "beyond its authorized scope"; and § 71-147(10), which forbids "unprofessional conduct," are unconstitutional under the 5th and 14th Amendments to the U.S. Constitution and article I, § 3, of the Nebraska Constitution, we determine that it would be improper for this court to consider those allegations in this case.

Styskal has been found to have touched the buttocks and bare breast of one of his dental patients. His defense is that he

was acting as a person practicing dentistry; that is, one who "[d]iagnoses, or professes to diagnose, . . . treats, or professes to treat disease, pain, deformity, deficiency, injury, or physical condition of the human teeth or jaws, or adjacent structure." § 71-183(6). Styskal would have this court define "adjacent structure" to include the muscles he palpated in this case, such as the trapezius and sternalis, and to determine that his actions were the practice of dentistry in that he was diagnosing and suggesting treatment for TMD. Because of the facts found as to Styskal's conduct in this case, we decline to enter this field.

As stated in *Broadrick v. Oklahoma*, 413 U.S. 601, 609, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973), a case involving political activity:

> In the context of this type of obviously covered conduct, the statement of Mr. Justice Holmes is particularly appropriate: "[I]f there is any difficulty . . . it will be time enough to consider it when raised by someone whom it concerns." *United States* v. *Wurzbach*, [280 U.S. 396, 399, 50 S. Ct. 167, 74 L. Ed. 508 (1930)].

The *Broadrick* Court went on to say:

> Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.

413 U.S. at 610.

We have followed these "traditional rules governing constitutional adjudication." In *Kwik Shop v. City of Lincoln*, 243 Neb. 178, 181, 498 N.W.2d 102, 105 (1993), we stated:

> To have standing to challenge the federal or state constitutionality of a statute, the contestant must be one who is, or is about to be, adversely affected by the language in question and must show that as a consequence of the alleged unconstitutionality, the contestant is deprived of a constitutionally protected right.

In *State v. Connely*, 243 Neb. 319, 324, 499 N.W.2d 65, 70 (1993), we stated: "In order to have standing to assert a claim of vagueness, [a defendant] must not have engaged in conduct

which is clearly prohibited by the questioned statute and cannot maintain that the statute is vague when applied to the conduct of others."

In the case before us, actions such as those committed by Styskal were stated to be improper by each of the five licensed dentists who testified in the proceeding. As set out above, Styskal himself testified there is no reason for a dentist to put his hands in a patient's underpants or to expose a patient's breast while doing a TMD examination. Styskal's conduct went far beyond any dental examination espoused by any witness or any textbook produced in the proceeding against him.

Any decision in this opinion on the appropriate range of TMD diagnosis and treatment, whether as to the constitutionality or interpretation of § 71-183, would be purely an advisory opinion, which is an activity in which this court endeavors not to engage.

The decision of the district court is affirmed.

AFFIRMED.