PONDEROSA RIDGE LLC, APPELLANT, V. BANNER COUNTY ET AL., APPELLEES, APPLICATION TA-19 OF PONDEROSA RIDGE LLC.

554 N.W.2d 151

Filed October 18, 1996.  No. S-95-1228.

Clark G. Nichols, of Nichols, Douglas, Kelly, and Meade, P.C., for appellant.

James M. Worden, Banner County Attorney, for appellee County.

James M. Mathis, of Holtorf, Kovarik, Ellison & Mathis, P.C., for appellee North Platte Natural Resources District.

Stephen D. Mossman, of Mattson, Ricketts, Davies, Stewart & Calkins, for appellees Eldon Lundberg, Dale Ward, and Wayne Palm.

WHITE, C.J., CAPORALE, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ., and RIST, D.J.

CAPORALE, J.

## I. STATEMENT OF CASE

The appellant, Ponderosa Ridge LLC, a Nebraska limited liability company, applied for a permit to transfer ground water from a well located in Banner County, Nebraska, to Laramie County, Wyoming. The appellees, Banner County, Eldon Lundberg, Wayne Palm, Dale Ward, and North Platte Natural Resources District, filed objections, and the director of the Department of Water Resources denied the application. In appealing, Ponderosa Ridge asserts, in summary, that the director's order is arbitrary, capricious, and unreasonable in that it is (1) contrary to law and (2) not supported by the evidence. We affirm.

## II. BACKGROUND

The application requested a transfer of a maximum of 1,532 acre-feet of water per year at a rate of no more than 1,368,000

gallons per day. The water was to be used to flush pig production facilities and then stored in the lagoon upstream from Ponderosa Ridge's well, which is located approximately 50 feet from the Nebraska-Wyoming border. Water from the lagoon was then to be used in center-pivot systems to irrigate land in Wyoming. The well was to be continuously operated 24 hours a day, 356 days a year, and was to provide a "cone of depression" which would trap any leakage from the lagoon and prevent any pollution or contamination of the aquifer downstream.

In entering his order of denial, the director determined that granting the permit would result in a beneficial use of the water, but that a supply developed from sources in Wyoming would be sufficient to meet the needs of Ponderosa Ridge, that the negative effects the withdrawal of ground water might cause could not be quantitatively determined, and that the expected impacts upon future demands were unclear. The facts relating to these findings are set forth in parts IV(1)(c)(ii) and (2) below.

### III. SCOPE OF REVIEW

In an appeal from the department, an appellate court's review of the director's factual determinations is limited to deciding whether such determinations are supported by competent and relevant evidence and are not arbitrary, capricious, or unreasonable. *Central Platte NRD v. City of Fremont, ante* p. 252, 549 N.W.2d 112 (1996). However, on questions of law, which include the meaning of statutes, a reviewing court is obligated to reach its conclusions independent of the legal determinations made by the director. *Id.*

### IV. ANALYSIS

Before we turn our attention to the summarized assignments of error, we consider whether all of the objectors had the requisite standing to challenge Ponderosa Ridge's application before the director. We have recently reaffirmed that in order to have standing to invoke a tribunal's jurisdiction, one must have some legal or equitable right, title, or interest in the subject of the controversy. See, *Metropolitan Utilities Dist. v. Twin Platte NRD, ante* p. 442, 550 N.W.2d 907 (1996);

*Marten v. Staab*, 249 Neb. 299, 543 N.W.2d 436 (1996); *SID No. 57 v. City of Elkhorn*, 248 Neb. 486, 536 N.W.2d 56 (1995). Standing to challenge the constitutionality of a statute under the federal or state Constitution depends upon whether one is, or is about to be, adversely affected by the language in question. To establish standing, the contestant must show that as a consequence of the alleged unconstitutionality, the contestant is, or is about to be, deprived of a protected right. See, *Metropolitan Utilities Dist., supra*; *State ex rel. Dept. of Health v. Jeffrey*, 247 Neb. 100, 525 N.W.2d 193 (1994); *Styskal v. Wright*, 246 Neb. 513, 519 N.W.2d 543 (1994). We have also explained that the fact that water rights of the constituents of a natural resources district may be affected by an application to appropriate water does not confer standing upon such a district to object to the application. See *Metropolitan Utilities Dist., supra*.

The record establishes that the individual objectors Lundberg and Ward had water use interests to protect; however, we are not directed to, nor do we find, any evidence that the individual objector Palm had any such interests. Neither have we been directed to, nor do we find, any evidence that the objectors Banner County and North Platte Natural Resources District had any such interests. Indeed, Banner County advised the director that it was appearing on behalf of its residents, and North Platte Natural Resources District stated that it was not "trying to be adversarial, necessarily, to any particular party," but, rather, that it was appearing to protect the public interest.

Standing relates to a court's power, that is, jurisdiction, to address the issues presented and serves to identify those disputes which are appropriately resolved through the judicial process. *State v. Baltimore*, 242 Neb. 562, 495 N.W.2d 921 (1993). See *Whitmore v. Arkansas*, 495 U.S. 149, 110 S. Ct. 1717, 109 L. Ed. 2d 135 (1990). Because the requirement of standing is fundamental to a court's exercising jurisdiction, a litigant or a court before which a case is pending can raise the question of standing at any time during the proceeding. *Baltimore, supra*. Under the record presented, we find that

Lundberg and Ward were the only objectors properly before the director.

### 1. LAW CLAIM

Ponderosa Ridge's claim that the director's order of denial is contrary to law rests on three premises: Neb. Rev. Stat. § 46-613.01 (Reissue 1993) unlawfully delegates legislative power to the director, in violation of Neb. Const. art. II, § 1, and art. III, § 1; the statute is so vague as to deny Ponderosa Ridge the due process of law required by U.S. Const. amend. XIV; and the statute, both facially and as applied, discriminates against interstate commerce, in violation of U.S. Const. art. I, § 8, cl. 3.

In considering these propositions, we bear in mind that a statute is presumed to be constitutional, and all reasonable doubts will be resolved in favor of its constitutionality. *State v. Carpenter, ante* p. 427, 551 N.W.2d 518 (1996); *Swanson v. State*, 249 Neb. 466, 544 N.W.2d 333 (1996); *CenTra, Inc. v. Chandler Ins. Co.*, 248 Neb. 844, 540 N.W.2d 318 (1995); *Callan v. Balka*, 248 Neb. 469, 536 N.W.2d 47 (1995). The unconstitutionality of a statute must be clearly demonstrated before a court can declare the statute unconstitutional. *Swanson, supra*; *Pick v. Nelson*, 247 Neb. 487, 528 N.W.2d 309 (1995); *Hlava v. Nelson*, 247 Neb. 482, 528 N.W.2d 306 (1995). The burden of establishing the unconstitutionality of a statute is on the one attacking its validity. *Carpenter, supra*; *Swanson, supra*; *Kuchar v. Krings*, 248 Neb. 995, 540 N.W.2d 582 (1995); *Chrysler Motors Corp. v. Lee Janssen Motor Co.*, 248 Neb. 322, 534 N.W.2d 309 (1995).

### (a) Unlawful Delegation

Section 46-613.01 provides:

> The Legislature recognizes and declares that the maintenance of an adequate source of ground water within this state is essential to the social stability of the state and the health, safety, and welfare of its citizens and that reasonable restrictions on the transportation of ground water from this state are a proper exercise of the police powers of the state. The need for such restrictions, which protect the health, safety, and general welfare of the citizens of

this state, is hereby declared a matter of legislative determination.

Any person, firm, city, village, municipal corporation, or other entity intending to withdraw ground water from any water well located in the State of Nebraska and transport it for use in another state shall apply to the Department of Water Resources for a permit to do so. In determining whether to grant such permit, the Director of Water Resources shall consider:

(1) Whether the proposed use is a beneficial use of ground water;

(2) The availability to the applicant of alternative sources of surface or ground water;

(3) Any negative effect of the proposed withdrawal on surface or ground water supplies needed to meet reasonable future demands for water in the area of the proposed withdrawal; and

(4) Any other factors consistent with the purposes of this section that the director deems relevant to protect the interests of the state and its citizens.

Issuance of a permit shall be conditioned on the applicant's compliance with the rules and regulations of the natural resources district from which the water is to be withdrawn. The applicant shall be required to provide access to his or her property at reasonable times for purposes of inspection by officials of the district or the Department of Water Resources.

The director may include such reasonable conditions on the proposed use as he or she deems necessary to carry out the purposes of this section.

In arguing that the statute unconstitutionally delegates legislative authority, Ponderosa Ridge contends that "[w]ith the exception of beneficial use, the statute gives no guidance to [Ponderosa Ridge], or the [d]irector, as to how to apply [the] factors. Nor does it define the factors." Brief for appellant at 19.

In *Lincoln Dairy Co. v. Finigan*, 170 Neb. 777, 780-81, 104 N.W.2d 227, 230-31 (1960), we observed:

> It is fundamental that the Legislature may not delegate legislative power to an administrative or executive authority. . . . The Legislature does have power to authorize an administrative or executive department to make rules and regulations to carry out an expressed legislative purpose, or for the complete operation and enforcement of a law within designated limitations. Such authority is administrative in its nature and its use by administrative officers is essential to the complete exercise of the powers of all departments. . . .
>
> The limitations of the power granted and the standards by which the granted powers are to be administered must, however, be clearly and definitely stated in the authorizing act.

Such standards may not rest on indefinite, obscure, or vague generalities, or upon extrinsic evidence not readily available. *Bosselman, Inc. v. State*, 230 Neb. 471, 432 N.W.2d 226 (1988). See, also, *Kwik Shop v. City of Lincoln*, 243 Neb. 178, 498 N.W.2d 102 (1993).

However, where the Legislature has provided reasonable limitations and standards for carrying out the delegated duties, there is no unconstitutional delegation of legislative authority. *Bamford v. Upper Republican Nat. Resources Dist.*, 245 Neb. 299, 512 N.W.2d 642 (1994), *cert. denied* ____ U.S. ____, 115 S. Ct. 201, 130 L. Ed. 2d 131; *Bosselman, Inc., supra*; *In re Application U-2*, 226 Neb. 594, 413 N.W.2d 290 (1987). In *State ex rel. Douglas v. Nebraska Mortgage Finance Fund*, 204 Neb. 445, 464-65, 283 N.W.2d 12, 24 (1979), we wrote:

> The exercise of a legislatively delegated authority to make rules and regulations to carry out an expressed legislative purpose, or for the complete operation or enforcement of a law with clearly designated limitations and standards, is not an exercise of legislative power. . . .
>
> The question of how far the Legislature should go in filling in the details of the standards which an administrative agency is to apply raises large issues of policy in which the Legislature has a wide discretion, and the court should be reluctant to interfere with such discre-

> tion. Such standards in conferring discretionary power upon an administrative agency must be reasonably adequate, sufficient, and definite for the guidance of the agency in the exercise of the power conferred upon it and must also be sufficient to enable those affected to know their rights and obligations. . . . The modern tendency is to be more liberal in permitting grants of discretion to an administrative agency in order to facilitate the administration of laws as the complexity of economic and governmental conditions increases.

See, also, *Bamford, supra*; *Kwik Shop, supra*; *Bosselman, Inc., supra*; *In re Application U-2, supra*. Delegation of legislative power is most commonly indicated where the relations to be regulated are highly technical or where regulation requires a course of continuous decision. *Anderson v. Tiemann*, 182 Neb. 393, 155 N.W.2d 322 (1967), *appeal dismissed* 390 U.S. 714, 88 S. Ct. 1418, 20 L. Ed. 2d 254 (1968).

We have acknowledged the difficulties inherent in requiring the Legislature to spell out each standard in areas of complex fields where expanding technology and complex theories change rapidly, *Bamford, supra*, and the Legislature has recognized the expertise and experience needed to determine the difficult questions presented in the overall management of water in this state when it required, pursuant to Neb. Rev. Stat. § 46-701 (Reissue 1993), that the director be a professional engineer with at least 5 years' experience in a position of responsibility in irrigation work, *Bamford, supra*; *In re Application U-2, supra*.

The question, therefore, is whether the challenged statute provides the director with adequate, sufficient, and definite standards within which to exercise his or her discretion. Section 46-613.01 provides four factors that the director must consider in determining whether to grant a permit to withdraw ground water and transport it to another state. The first of these is whether the proposed use is a beneficial use of ground water. Ponderosa Ridge concedes in its brief that this factor is not vague and thus provides adequate, sufficient, and definite standards within which the director must exercise his or her

discretion. Indeed, the term "beneficial use" is found throughout the statutes pertaining to water use and is a term used in the Nebraska Constitution. Neb. Const. art. XV, § 6; Neb. Rev. Stat. §§ 46-233.01(2)(d), 46-242(1), 46-246, 46-252(1), 46-288(2), and 46-642 (Reissue 1993).

The second factor is the availability to an applicant of alternative sources of surface or ground water. Ponderosa Ridge complains that as this factor is not defined, its impact cannot be determined. That is to say, according to Ponderosa Ridge, the statute does not specify whether there must be no water at all available for appropriation from another source, or whether cost to the applicant for alternative sources is a consideration. Ponderosa Ridge's complaint seems to be that this factor is subject to interpretation by the director; that is, the impact of this factor will vary from case to case, depending on the facts of each case. But just as the fact that a term is subject to interpretation by an administrative agency does not render the term unconstitutionally vague, see, *Good Samaritan Hospital v. Shalala*, 508 U.S. 402, 113 S. Ct. 2151, 124 L. Ed. 2d 368 (1993); *Vulcraft v. Karnes*, 229 Neb. 676, 428 N.W.2d 505 (1988); *Hadden v. Aitken*, 156 Neb. 215, 55 N.W.2d 620 (1952), *overruled on other grounds, Stauffer v. Weedlun*, 188 Neb. 105, 195 N.W.2d 218 (1972), neither does such a circumstance in and of itself mean that there has been an unlawful delegation of legislative power. The test, as noted previously, is whether the director has been provided with an adequate, sufficient, and definite standard with which to exercise his or her discretion. By being told that the availability of water is a factor to be considered, such has been accomplished. The Legislature cannot be expected to foresee every possible circumstance under which it might be said that water is or is not available. The questioned language certainly puts an applicant, any objector, and the director on notice that the availability of water to an applicant is to be considered.

The third factor is whether the proposed withdrawal would have a negative effect on surface or ground water supplies needed to meet reasonable future demands in the area of the proposed withdrawal. Given the language of § 46-613.01 that the "Legislature recognizes and declares that the maintenance

of an adequate source of ground water within this state is essential to the social stability of the state and the health, safety, and welfare of its citizens," this factor is also sufficiently definite to put everyone, including the director, on notice of what is to be considered.

The fourth and last factor allows the director to consider any other factor consistent with the purposes of the statute which the director deems relevant to protect the interests of the state and its citizens. In this regard, the director noted in his order that although some of the parties raised issues with which he had not dealt, in view of his other findings, resolution of those issues was not required. He then specifically declined to apply this statutory factor. Thus, as Ponderosa Ridge has not been, and is not about to be, adversely affected by that factor, it has no standing to challenge it. See discussion concerning standing in part IV above.

For the foregoing reasons, it cannot be said in this case that § 46-613.01 delegates legislative power to the director, in violation of Neb. Const. art. II, § 1, or art. III, § 1.

### (b) Due Process Vagueness

When a legislative enactment is challenged on vagueness grounds, the issue is whether the two requirements of procedural due process are met: (1) adequate notice to citizens and (2) adequate standards to prevent arbitrary enforcement. In other words, due process requires that an enactment supply (1) a person of ordinary intelligence a reasonable opportunity to know what is prohibited and (2) explicit standards for those who apply it. *Bamford v. Upper Republican Nat. Resources Dist.*, 245 Neb. 299, 512 N.W.2d 642 (1994), *cert. denied* ____ U.S. ____, 115 S. Ct. 201, 130 L. Ed. 2d 131; *Kwik Shop v. City of Lincoln*, 243 Neb. 178, 498 N.W.2d 102 (1993). As discussed in the immediately preceding subsection of this opinion, the challenged factors applied by the director provide the applicant, objectors, and the director with sufficient notice and standards. Therefore, the challenged statute is not unconstitutionally vague, in violation of U.S. Const. amend. XIV.

(c) Discrimination Against Interstate Commerce

In *Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 102 S. Ct. 3456, 73 L. Ed. 2d 1254 (1982), the U.S. Supreme Court held that water was an article of commerce, implicating the Commerce Clause of the U.S. Constitution. See U.S. Const. art. I, § 8, cl. 3. However, the fact that water is an article of commerce and that Congress has not exercised federal legislation in the area "does not foreclose state regulation of its water resources, of the uses of water within the State, or indeed, of interstate commerce in water." 458 U.S. at 954. In *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S. Ct. 844, 25 L. Ed. 2d 174 (1970), the U.S. Supreme Court provided the general rule for determining the validity of state statutes affecting interstate commerce:

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . . . If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

Richard S. Harnsberger et al., Interstate Transfers of Water: State Options After *Sporhase*, 70 Neb. L. Rev. 754, 769 (1991), states:

> To pass constitutional muster under the *Bruce Church* test, a statute that burdens interstate commerce must serve a legitimate local interest and operate even-handedly on both interstate and intrastate commerce. If it does, the Court then weighs the beneficial local effects to be produced against the burden imposed on interstate commerce. State legislation will be upheld only when it incidentally burdens or discriminates against interstate commerce; state legislation that imposes burdens on commerce that are clearly excessive in relation to local benefits is invalid. Where burdens are not clearly exces-

sive in relation to the local benefits, the constitutionality of a statute then depends on the character of the local interest and whether it could be promoted equally well by means having a lesser impact on interstate activities.

In *Sporhase, supra*, the U.S. Supreme Court held that a portion of the predecessor statute to the current § 46-613.01 was an unconstitutional burden on interstate commerce. The predecessor to the challenged statute provided:

> Any person, firm, city, village, municipal corporation or any other entity intending to withdraw ground water from any well or pit located in the State of Nebraska and transport it for use in an adjoining state shall apply to the Department of Water Resources for a permit to do so. If the Director of Water Resources finds that the withdrawal of the ground water requested is reasonable, is not contrary to the conservation and use of ground water, and is not otherwise detrimental to the public welfare, he shall grant the permit if the state in which the water is to be used grants reciprocal rights to withdraw and transport ground water from that state for use in the State of Nebraska.

§ 46-613.01 (Reissue 1978).

### (i) Facial Validity

The U.S. Supreme Court stated that a facial examination of the first three conditions set forth in the predecessor statute did not impermissibly burden interstate commerce.

> The State's interest in conservation and preservation of ground water is advanced by the first three conditions in § 46-613.01 for the withdrawal of water for an interstate transfer. . . . Although Commerce Clause concerns are implicated by the fact that § 46-613.01 applies to interstate transfers but not to intrastate transfers, there are legitimate reasons for the special treatment accorded requests to transport ground water across state lines. Obviously, a State that imposes severe withdrawal and use restrictions on its own citizens is not discriminating against interstate commerce when it seeks to prevent the uncontrolled transfer of water out of the State. An

exemption for interstate transfers would be inconsistent with the ideal of evenhandedness in regulation. At least in the area in which appellants' Nebraska tract is located, the first three standards of § 46-613.01 may well be no more strict in application than the limitations upon intrastate transfers imposed by the Upper Republican Natural Resources District.

Moreover, in the absence of a contrary view expressed by Congress, we are reluctant to condemn as unreasonable, measures taken by a State to conserve and preserve for its own citizens this vital resource in times of severe shortage. Our reluctance stems from the "confluence of [several] realities." *Hicklin v. Orbeck*, 437 U. S. 518, 534[, 98 S. Ct. 2482, 57 L. Ed. 2d 397] (1978). First, a State's power to regulate the use of water in times and places of shortage for the purpose of protecting the health of its citizens—and not simply the health of its economy—is at the core of its police power. For Commerce Clause purposes, we have long recognized a difference between economic protectionism, on the one hand, and health and safety regulation, on the other. See *H. P. Hood & Sons v. Du Mond*, 336 U. S. 525, 533[, 69 S. Ct. 657, 93 L. Ed. 865] (1949). Second, the legal expectation that under certain circumstances each State may restrict water within its borders has been fostered over the years not only by our equitable apportionment decrees, see, *e. g., Wyoming v. Colorado*, 353 U. S. 953[, 77 S. Ct. 865, 1 L. Ed. 2d 906] (1957), but also by the negotiation and enforcement of interstate compacts. Our law therefore has recognized the relevance of state boundaries in the allocation of scarce water resources. Third, although appellee's claim to public ownership of Nebraska ground water cannot justify a total denial of federal regulatory power, it may support a limited preference for its own citizens in the utilization of the resource. See *Hicklin v. Orbeck, supra*, at 533-534. In this regard, it is relevant that appellee's claim is logically more substantial than claims to public ownership of other natural resources. See *supra*, at 950-951. Finally,

given appellee's conservation efforts, the continuing availability of ground water in Nebraska is not simply happenstance; the natural resource has some indicia of a good publicly produced and owned in which a State may favor its own citizens in times of shortage.

*Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 955-57, 102 S. Ct. 3456, 73 L. Ed. 2d 1254 (1982). However, the Court did find that the reciprocity provision of the predecessor statute violated the Commerce Clause and was thus unconstitutional. As Colorado forbad interstate transfers of ground water, the reciprocity provision operated as a barrier to commerce between Nebraska and Colorado. Nebraska thus bore the initial burden of demonstrating a close fit between the reciprocity requirement and the asserted local purpose of conservation and preservation. The Court concluded that this burden was not met because there was no evidence that the restriction was narrowly tailored to the conservation and preservation rationale. On remand, we ruled that the reciprocity provision was severable from the statute and that the remainder constituted a viable statute. *State ex rel. Douglas v. Sporhase*, 213 Neb. 484, 329 N.W.2d 855 (1983).

Two other cases involving similar issues, *City of El Paso v. Reynolds*, 563 F. Supp. 379 (D.N.M. 1983) (*El Paso I*), and *City of El Paso v. Reynolds*, 597 F. Supp. 694 (D.N.M. 1984) (*El Paso II*), are of note. In *El Paso I*, the city, located in the State of Texas, sought to transfer ground water from New Mexico to Texas. New Mexico denied the city's applications on the ground that the New Mexico Constitution precluded utilization of New Mexico ground water outside the borders of the state. A New Mexico statute also expressly prohibited the transport of ground water from New Mexico for use in another state.

The city then sought a federal court declaration that New Mexico's ground water embargo was unconstitutional and sought an injunction against its enforcement. The federal district court held that the ground water embargo violated the Commerce Clause of the U.S. Constitution and enjoined the defendants from enforcing it. The court reasoned that as New Mexico's embargo barred the export of ground water

absolutely, it was an explicit barrier to interstate commerce and subject to the strictest scrutiny; i.e., the defendants were required to "demonstrate that the embargo serve[d] a legitimate local purpose, that it [was] narrowly tailored to that purpose and that there [were] no adequate nondiscriminatory alternatives." *El Paso I*, 563 F. Supp. at 388. The defendants asserted that the purpose of the overall system of ground water regulation was to conserve and preserve the state's internal water supply; however, the court concluded that while the state's scheme of water regulation demonstrated a genuine effort to promote optimum utilization of its diminishing water resources and might justify a limited, nondiscriminatory burden on interstate commerce, it could not support a total ban on interstate transportation of ground water.

The New Mexico Legislature then repealed the challenged statute, enacted provisions dealing with the out-of-state use of water, and otherwise amended New Mexico's water code. *El Paso II*. Following these enactments, the defendants appealed the court's decision in *El Paso I* to the U.S. Court of Appeals for the Tenth Circuit, urging that the case had become moot. The Tenth Circuit vacated the district court's judgment and remanded the matter for consideration in light of the intervening change in New Mexico law.

In *El Paso II*, the city challenged the constitutionality of the intervening legislation. The new export statute required New Mexico's state engineer to find that an applicant's withdrawal and transportation of water for use outside the state would not impair existing water rights, would not be contrary to the conservation of water within the state, and was not otherwise detrimental to the public welfare of the citizens of New Mexico in order to approve an application. The city claimed that allowing exports only when they were not contrary to the conservation of water within the state and not otherwise detrimental to the public welfare of the citizens of New Mexico unconstitutionally discriminated against interstate commerce. The federal district court ruled otherwise, noting that on its face, the statute appeared to apply the conservation and public welfare criteria evenhandedly, as the new export statute mirrored the requirements of the statute governing applications

for new in-state appropriations of ground water from declared basins. In addition, the court wrote:

> Although the court in *Sporhase* did not delineate the extent to which a state may prefer its own citizens in the utilization of water, it provided some guidelines. A state may not limit water exports merely to protect local economic interests. . . . This is true even though the health of the state's economy has a direct bearing on the public welfare of its citizens. . . . Other than excluding economic interests, however, the Court did not limit the public welfare interests a state may protect by regulating interstate commerce in ground water.
>
> On its face, [the new export statute] does not direct the State Engineer to deny applications for exports that would be detrimental only to the economic interests of New Mexico's citizens. "Public welfare" is a broad term including health and safety, recreational, aesthetic, environmental and economic interests. Admittedly, except to the extent that it refers to bare human survival, every aspect of the public welfare has economic overtones. This does not mean that New Mexico may constitutionally exercise a limited preference for its citizens only when their survival is at stake. The Supreme Court in *Sporhase* did not equate "public welfare" with "human survival." However, when the State exercises a preference for its citizens under the rubric of protecting their public welfare and economic interests are implicated, the resulting burden on interstate commerce must be weighed against the putative, non-economic local benefits. . . . If the public welfare criterion is used to effectuate simple economic protectionism, a per se rule of invalidity will be applied. . . . If it is used to promote a legitimate purpose with only incidental burdens on interstate commerce, the Court must try to accommodate the competing local and national interests. . . . If equally effective, less burdensome alternatives are available, the State must use them. . . .
>
> . . . .

. . . The term "public welfare" includes many interests, some of which the State may legitimately advance by regulating water exportation. The statutory use of the term is not forbidden since it can be narrowed by construction in this court, in the state administrative proceedings and in the state courts.

*El Paso II,* 597 F. Supp. at 700-02. As for the conservation factor, the court stated that "[a] state may . . . 'conserve' water within its borders for the use of its citizens to the same limited extent that it may prefer its citizens in the utilization of the resource." *Id.* at 702.

The city also objected to six additional factors that the state engineer was required to consider when acting upon any application to export ground water. The first four factors required the state engineer to determine whether there were water shortages within the state which could be alleviated by the intrastate transportation of the water sought for export. The *El Paso II* court found that there was a legitimate reason for this requirement in that a determination of whether a shortage of water existed in the state was necessary if the state engineer was to constitutionally exercise a preference for the citizens of New Mexico in accordance with *Sporhase v. Nebraska ex rel. Douglas,* 458 U.S. 941, 102 S. Ct. 3456, 73 L. Ed. 2d 1254 (1982). The remaining two factors required an evaluation of the export applicant's water supply, of the demand placed on that supply, and of the alternative sources of supply available to the applicant in the state of import. The court found that there was also a legitimate reason for this requirement in that a state may favor its own citizens in the utilization of scarce water resources unless the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits, and the local benefits cannot be weighed against the burdens on commerce without knowledge of the export applicant's need for the water relative to that of prospective in-state users. The *El Paso II* court did, however, find those portions of the new legislation that required the application of conservation and public welfare criteria to all interstate uses of ground water, but only to some intrastate uses, to be unconstitutional

as discriminating on their face against interstate commerce. In that regard, the court wrote:

> While the State may constitutionally regulate water usage to promote the conservation of water and the public welfare of its citizens, it may not require interstate commerce to shoulder the entire burden of furthering those interests. There is no legitimate reason to deny interstate transfers and domestic wells if detrimental to those interests yet permit intrastate transfers and domestic wells when they are detrimental to them.

*El Paso II*, 597 F. Supp. at 704.

In contrast, the transportation of Nebraska ground water from the underlying land for any use, interstate or intrastate, is severely curtailed. The transportation of ground water for intrastate use is prohibited except for specific statutory exceptions. See, Neb. Rev. Stat. §§ 46-638 through 46-650 and 46-675 through 46-690 (Reissue 1993); Neb. Rev. Stat. § 46-691 (Supp. 1995). See, also, *Sorensen v. Lower Niobrara Nat. Resources Dist.*, 221 Neb. 180, 190, 376 N.W.2d 539, 547 (1985) ("[b]y enacting the Municipal and Rural Domestic Ground Water Transfers Permit Act as a part of Nebraska's policy, the Legislature altered certain aspects of common law governing use of ground water. Permittees under the act are exonerated from the common-law prohibition against transfer and transportation of ground water"); *State ex rel. Douglas v. Sporhase*, 208 Neb. 703, 706-07, 305 N.W.2d 614, 617 (1981) ("[s]ince the Nebraska common law of ground water permitted use of the water only on the overlying land, legislative action was necessary to allow for transfers off the overlying land, even for as pressing a need as supplying urban water users. . . . [T]he Legislature has the power to determine public policy with regard to ground water and . . . it may be transferred from the overlying land only with the consent of and to the extent prescribed by the public through its elected representatives"), *reversed on other grounds* 458 U.S. 941, 102 S. Ct. 3456, 73 L. Ed. 2d 1254 (1982). If a proposed intrastate use comes within the purview of the Municipal and Rural Domestic Ground Water Transfers Permit Act, §§ 46-638 through 46-650, or the Industrial Ground Water Regulatory

Act, §§ 46-675 through 46-690, the prospective user of the ground water is required to apply for a permit to do so, similar to the requirements imposed on interstate transportation of ground water. If a proposed intrastate use comes within the purview of the ground water transfer law, § 46-691, the applicable natural resources district is required to conduct an investigation of the withdrawal and transfer of ground water if an affected party objects to the transfer, and may prohibit the transfer if it does not comply with the district's rules and regulations or is required to request a hearing before the Department of Water Resources if the proposed transfer does not meet certain statutory requirements.

The Municipal and Rural Domestic Ground Water Transfers Permit Act regulates the transfer of ground water for the supply of water to inhabitants of cities, villages, or rural areas for domestic or municipal purposes. In order to transfer ground water for such a purpose, a public water supplier is required to make an application to the director of the Department of Water Resources for a permit. § 46-639. Upon receiving an application, the director is required to cause a notice of such application to be published, and the notice must state that any interested person may object to and request a hearing on the application. § 46-640. The director must grant the application if he or she finds that the withdrawal and transportation of ground water requested by an applicant are reasonable, are not contrary to the conservation and beneficial use of ground water, and are not otherwise detrimental to the public welfare. § 46-642.

The Industrial Ground Water Regulatory Act governs the use of water for industrial purposes. Any person wanting to transfer ground water from aquifers located within the State of Nebraska for industrial purposes is required to apply for a permit to do so. §§ 46-677 and 46-678. After the director accepts the application for such a permit, he or she is required to set a time and place for a public hearing ȯn the application. § 46-680. The director shall grant the permit only if he or she finds that the applicant's withdrawal and any transfer of ground water are in the public interest. In determining

whether the withdrawal and transfer are in the public interest, the director is required to consider:

(a) Possible adverse effects on existing surface or ground water users;

(b) The effect of the withdrawal and any transfer of ground water on surface or ground water supplies needed to meet reasonably anticipated domestic and agricultural demands in the area of the proposed ground water withdrawal;

(c) The availability of alternative sources of surface or ground water reasonably accessible to the applicant in or near the region of the proposed withdrawal or use;

(d) The economic benefit of the applicant's proposed use;

(e) The social and economic benefits of existing uses of surface or ground water in the area of the applicant's proposed use and any transfer;

(f) Any waivers of liability from existing users filed with the director; and

(g) Other factors reasonably affecting the equity of granting the permit.

§ 46-683.

The ground water transfer law provides, in part:

Any person who withdraws ground water for agricultural purposes, or for any purpose pursuant to a ground water remediation plan as required under the Environmental Protection Act . . . from aquifers located within the State of Nebraska may transfer the use of the ground water off the overlying land if the ground water is put to a reasonable and beneficial use within the State of Nebraska and is used for an agricultural purpose, or for any purpose pursuant to a ground water remediation plan as required under the Environmental Protection Act, including the providing of water for domestic purposes, after transfer, and if such withdrawal, transfer, and use (a) will not significantly adversely affect any other water user, (b) is consistent with all applicable statutes and rules and regulations, and (c) is in the public interest.

§ 46-691(1). Any affected party may file an objection to the transfer with the office of the natural resources district containing the land from which the ground water is withdrawn. § 46-691(2). Either upon the filing of an objection or on its own initiative, the natural resources district is required to conduct a preliminary investigation to determine if the withdrawal, transfer, and use of ground water are consistent with the requirements of § 46-691(1). If the natural resources district has reason to believe that the withdrawal, transfer, or use may not comply with the rules or regulations of the district, it may prohibit such withdrawal, transfer, or use. If the natural resources district has reason to believe that the withdrawal, transfer, and use are consistent with the rules and regulations of the district, but may not comply with the requirements of § 46-691(1), the district is required to request a hearing before the department. § 46-691(2).

Although the factors that the director is to consider in determining whether to grant a permit for an interstate transfer of ground water are not identical to those considered for other intrastate transfers of ground water, the differences do not require interstate commerce to suffer any greater burden than that placed on intrastate commerce. As noted earlier, the first of the factors the director must consider in determining whether to grant a permit for an interstate transfer of water, whether the proposed use is a beneficial one, runs throughout the code governing the regulation of water. Indeed, the common law in Nebraska forbids the owner of land from extracting ground water under his or her land in excess of a beneficial use. *State ex rel. Douglas v. Sporhase*, 208 Neb. 703, 305 N.W.2d 614 (1981), *reversed on other grounds* 458 U.S. 941, 102 S. Ct. 3456, 73 L. Ed. 2d 1254 (1982).

The second factor, the availability of alternative sources of ground water, fosters the purpose of conserving and preserving ground water in the state, an "unquestionably legitimate and highly important" purpose. *Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 954, 102 S. Ct. 3456, 73 L. Ed. 2d 1254 (1982).

The third factor, the negative effects of the proposed withdrawal, fosters the purpose of conserving and preserving ground water.

Since, as determined in part IV(1)(a) above, the fourth factor, allowing the director to consider other unnamed relevant matters, was not applied in this case, Ponderosa Ridge has no standing to challenge its constitutionality.

Thus, although § 46-613.01 operates only on interstate uses and imposes a burden on interstate commerce, when compared with the regulation of intrastate uses of ground water, the overall regulation relevant to this litigation is evenhanded. "Obviously, a State that imposes severe withdrawal and use restrictions on its own citizens is not discriminating against interstate commerce when it seeks to prevent the uncontrolled transfer of water out of the State. An exemption for interstate transfers would be inconsistent with the ideal of evenhandedness in regulation." *Sporhase*, 458 U.S. at 956.

Consequently, the statute does not facially violate the Commerce Clause found in U.S. Const. art. I, § 8, cl. 3.

### (ii) Validity as Applied

But that does not end our Commerce Clause inquiry, for Ponderosa Ridge also asserts that the statute is unconstitutional in that regard as applied. It first argues that the director erred by requiring it to quantitatively determine the negative effects of the proposed withdrawal and requiring it to demonstrate why water from Wyoming sources was not its first choice. However, as discussed in part (2) below, Ponderosa Ridge bears the burden of presenting evidence on these factors in order that the director can make a determination on whether to grant the application. Such a requirement does not place an impermissible burden on Ponderosa Ridge.

Ponderosa Ridge next argues that the director discriminated against interstate commerce in his order by stating: "Finally, denying [the application] will not result in the well being shut down. Instead it will be pumped with the water used to irrigate cropland in Nebraska . . . ." The argument is that in the director's order, the purposes of conservation and preservation are not being considered if the ground water from the well is

to be used in Nebraska, but are considered if the ground water is to be used in Wyoming.

However, this aspect of the order more fully reads:

4. <u>Negative Effects</u>

. . . .

Finally, denying [the application] will not result in the well being shut down. Instead it will be pumped with the water used to irrigate cropland in Nebraska . . . . Thus, in pumping from the aquifer the well would still serve as a safeguard against the possible spread of pollution in the manner described by Lerwick . . . and Listone [sic] . . . .

The testimony of James R. Lerwick, vice president of the board of directors of Ponderosa Ridge and president of the company that manages the daily operation of Ponderosa Ridge's production facility referred to in the director's order, was as follows:

Q Is there a particular reason that the well is located downgradient from the nursery facilities?

A Well, of course, the most obvious is that we'll learn the water flows this way from west to east downgradient and that as we've worked with Wyoming DEQ, we've worked under an assumption that the cone of depression is the best monitoring of our lagoons and the deeper we can develop the cone of depression, the more likely we will be to observe if there is any leakage of nitrates or any other contaminants to the water table and not only detect it, but be able to control it, and so —

Q And how do you control it?

A The way that we control it, of course, is to create that cone of depression that lets the water flow until it reaches the cone and then down into our pumping, pump station, and back into our system, and that would allow us at some point in time, if it ever came to that, to empty the lagoons, which would stop the nitrate, continue the pumping for irrigation or whatever purposes until the nitrate leaching ceased.

The testimony of Christopher D. Lidstone, a geologist and hydrologist called by Ponderosa Ridge, to which the director referred, was as follows:

> Q Would you describe for me how you were involved in the water quality permitting for Ponderosa in Wyoming?
>
> A In the State of Wyoming, DEQ Water Quality Division has a series of rules. The Chapter 3 regulations supplied [sic] to wastewater lagoons, as part of the requirement for a permit to construct, one must evaluate the aquifer conditions in the area and develop as appropriate potential monitoring locations and to look at, from the standpoint of potential for contamination of the ground water, and that's Water Quality's primary role.
>
> . . . .
>
> With respect to the pig farms that . . . Lerwick has spoken about, they were fairly new in 1990. That was really the first of all the commercial pig farms that had been applied to — and . . . Lerwick's operation had a water-handling scheme that required land application as part of it, and also required the flushing and water use aspects of things. At that stage of the game, we proposed to Water Quality Division that we actually use our production wells for monitoring, and Water Quality Division required us to establish that the pumping well itself would serve as a monitoring point and that's where we first began the modeling efforts that we've done on behalf of the various pork operations over the past.

Thus, the director was not discriminating against interstate commerce by the questioned statement in his order, but, rather, was noting that denying the permit will not cause a negative effect because the well could still be used as a monitoring point to check for contamination from leakage of Ponderosa Ridge's wastewater lagoons. In addition, the director did not state that the quantity of water sought to be transferred could still be used to irrigate cropland in Nebraska. Therefore, the inference Ponderosa Ridge wishes to draw, that the purposes of preservation and conservation were ignored because the water sought to be withdrawn for Ponderosa

Ridge's project could be used to irrigate cropland in Nebraska, is not warranted. The North Platte Natural Resources District was required by the Nebraska Legislature to file a ground water management plan, which must address issues of ground water conservation and management, including when to impose quantity controls. § 46-673.01. The director's order therefore has no bearing on the quantity of water that can be withdrawn from the well to irrigate cropland in Nebraska.

### (d) Resolution

As on the issues in this case § 46-613.01 does not unconstitutionally delegate legislative power to the director, is not vague, and does not violate the Commerce Clause, there is no merit to the first summarized assignment of error.

### 2. EVIDENCE CLAIM

In considering whether the evidence supports the director's order such that the order is not arbitrary, capricious, and unreasonable, we recall that a decision is arbitrary when it is made in disregard of the facts or circumstances and without some basis which would lead a reasonable person to the same conclusion. *Central Platte NRD v. City of Fremont, ante* p. 252, 549 N.W.2d 112 (1996). A capricious decision is one guided by fancy rather than by judgment or settled purpose; such a decision is apt to change suddenly; it is freakish, whimsical, humorsome. *Id.* The term "unreasonable" can be applied to an administrative decision only if the evidence presented leaves no room for differences of opinion among reasonable minds. *Id.*

As detailed in part (1) above, in its order, the director considered three of the four factors listed in § 46-613.01.

### (a) Beneficial Use

First, the director found that Ponderosa Ridge's proposed use is a beneficial one. Since no appellee with standing to do so has filed a separate cross-appeal with respect to this finding, we do not concern ourselves with whether the use is in fact beneficial; rather, for the purpose of this analysis, we treat it as being such.

### (b) Availability of Water

As for the second, or water availability, factor, the director found that

> it appears a supply developed from sources in Wyoming would be sufficient to meet the needs of Ponderosa Ridge. While costs may be a factor in rejecting that alternative . . . Lerwick's remarks . . . and Malm's testimony . . . suggest Ponderosa Ridge has not thoroughly explored all the possibilities. . . . Ponderosa Ridge has sufficient financial resources for that purpose . . . .

The record reveals that a supply of water is necessary for Ponderosa Ridge's planned operations and that there is no body of surface water in the vicinity of its premises. However, the record also establishes that a number of sources of ground water exist other than the source proposed in the subject application. Ponderosa Ridge has purchased the superior right to use the first 300 gallons per minute of continuous waterflow from the "Malm 3-1" well. In addition, it has purchased, if Malm Ranch Company finds using the effluent water is no longer economical, the right to use the Malm 3-1 well at 950 gallons per minute or 180 acre-feet from the Malm 33-1 well. In addition, Lerwick testified that Ponderosa Ridge could negotiate to use water from the "Anderson No. 2" well to flush and water the latter's facilities. Moreover, Ponderosa Ridge has not applied with the Wyoming state engineer to drill or change the use of any well to flush and water the facilities.

Nonetheless, Ponderosa Ridge argues that

> [t]he requirement of the Wyoming Department of Environmental Quality for a "capture well" makes it not only necessary, but much more efficient, to have the well downgradient from the lagoons. Use of the Malm 3-1 well, a mile upgradient, or the Anderson No. 2 well, three-fourths of a mile upgradient, as proposed by the protesters['] expert, Vincent Dreeszen . . . would obviously require pumping a great deal more water to provide a cone of depression that would intercept contamination from the lagoons, than would the location chosen by Ponderosa Ridge . . . .

Brief for appellant at 31-32. However, Vincent Dreeszen, a ground water consultant, testified that either the Malm 3-1 well or the Anderson No. 2 well would provide a capture zone for the entire project.

The decision of the director concerning this second factor is supported by competent and relevant evidence.

### (c) Negative Effect

In considering the third, or negative effect, factor, the director found that Lidstone's computations were known to be in error. The director went on to write:

> But, whether they overstate additional drawdown (inferred from his belief that the water table will continue to rise), or whether they understate it (due to unquantified corrections to account for boundary conditions), cannot be determined. Because of that uncertainty, negative effects withdrawals from [the subject well] might cause cannot be quantitatively determined. Consequently, expected impacts upon future demands are unclear also.

In stating in the order that because of the uncertainty of Lidstone's computations, the negative effects of the withdrawal could not be quantitatively determined, the director seems to have placed a burden of production and proof on Ponderosa Ridge with regard to the negative effects of the withdrawal. Although the director did not make any finding as to what the negative effects of the withdrawal would be, he apparently found against Ponderosa Ridge on this factor because he could not make a determination as to the precise nature of the negative effects of the proposed withdrawal.

The question is whether an applicant bears the burden of production and proof on a factor that the director must consider; i.e., Must an applicant prove that the negative effects of a proposed withdrawal are minimal or are outweighed by the potential benefits of the proposed use?

The appellees cite to *In re Application U-2*, 226 Neb. 594, 413 N.W.2d 290 (1987), for the proposition that the burden is on an applicant to convince the director to approve the application. In that case, a department regulation provided that in addition to notice to be published, each application was to be

accompanied by sufficient hydrologic information. In dicta, we observed:

> The objectors knew from reading the regulation above that they could defeat the application by showing that the applicant did not supply sufficient information to permit the director to approve the application. Objectors presented their position by skilled, close cross-examination of applicant's experts and by presenting an expert witness of their own.

*Id.* at 609-10, 413 N.W.2d at 301. However, a similar department regulation is not found in the record of this case, and for that reason, *In re Application U-2* is not applicable to these facts.

Nonetheless, someone must present evidence relating to the factors that the director must consider in order to determine whether to grant an application. Generally, it is the party asserting the affirmative of an issue that has the burden of proving that issue. *Alliance RR. Comm. Credit Union v. County of Box Butte*, 243 Neb. 840, 503 N.W.2d 191 (1993). We conclude that an applicant bears the burden of providing the director enough evidence on which to base a decision.

Lidstone testified that there would be minimal negative impacts. However, Dreeszen testified that there could be significant negative consequences and criticized Lidstone's findings. The director was free to believe one expert and disbelieve the other. See *Berggren v. Grand Island Accessories*, 249 Neb. 789, 545 N.W.2d 727 (1996). In this case, not only did the director not believe Lidstone, he found that Lidstone's computations were in error. He therefore could properly find that Ponderosa Ridge had failed in its burden of proof in that regard.

(d) Resolution

As the director could properly find that although the proposed use was beneficial, alternative sources of water were available, and that the negative effects of the proposed withdrawal could not be determined from the evidence presented, the director's denial of Ponderosa Ridge's application cannot be said to be arbitrary, capricious, or unreasonable.

Accordingly, there is no merit to the second summarized assignment of error.

## V. JUDGMENT

Inasmuch as the record sustains neither summarized assignment of error, the order of the director is, as first noted in part I, affirmed.

AFFIRMED.

FAHRNBRUCH, J., not participating.