751 N.W.2d 168 (2008)
16 Neb. App. 766
Roberta J. SHERMAN, appellee,
v.
Blaine A. SHERMAN and Frances M. Vasa, appellants.
No. A-07-024.
Court of Appeals of Nebraska.
June 10, 2008.
*170 Amy L. Patras and Keith A. Harvat, of Waite, McWha & Harvat, North Platte, and Michael J. McQuillan, of McQuillan & McQuillan, Ogallala, for appellants.
Michael V. Smith, of Smith & King, P.C., Gordon, and William B. Quigley, of Quigley, Dill & Quigley, Valentine, for appellee.
SIEVERS, MOORE, and CASSEL, Judges.
SIEVERS, Judge.
This lawsuit has at its core the operation of the Sherman Ranch (Ranch) located in Cherry County, Nebraska, composed of nearly 15,000 acres including owned and leased land. The Ranch's operation was complicated by the fact that an undivided half of the Ranch's owned land was placed in a trust after the death of the Sherman family patriarch, Hugh Sherman, but the three named trustees ran the Ranch as though the trust did not exist. Moreover, in a number of instances where written agreements were obviously desirable, if for no other reason than to avoid this sort of interfamily litigation, there were no such agreements. Therefore, and perhaps predictably, this litigation ensued.

FACTUAL AND PROCEDURAL BACKGROUND
Hugh and Roberta J. Sherman, husband and wife, were the long-time owners and *171 operators of the Ranch. Beginning in 1997, Hugh requested that Blaine A. Sherman, one of Hugh and Roberta's nine children, move onto the Ranch to help run it. Blaine agreed to move to and work on the Ranch, and he did so beginning May 1, 1998, bringing with him some 230 cow-calf pairs, a number of cattle he was running for a third party, six horses, haying and well-drilling machinery, and a substantial amount of baled hay. He and his family moved into a residence on one of the leased tracts. Although attempts to do so were made, no written agreement was ever reached between Blaine and Hugh or Roberta regarding the terms of his employment and occupancy of the Ranch.
On May 22, 1998, at a time when he was terminally ill, Hugh executed his last will and testament, which established a testamentary credit shelter trust (hereinafter Trust). The Trust was funded with Hugh's undivided one-half interest in approximately 9,000 acres of the Ranch's owned real estate and 160 cows. Roberta, Blaine, and Frances Vasa (Frances), one of Hugh and Roberta's daughters, were named copersonal representatives of the estate and cotrustees of the Trust. The Trust provided that Roberta was to receive all income from the Trust during her lifetime, and as much of the principal of the Trust as the trustees deemed advisable to provide for Roberta's health, education, support, and maintenance. At Roberta's death, the Trust was to terminate and the assets were to be distributed to Hugh and Roberta's children.
Hugh died a week after making the above-described will. Blaine continued working and residing at the Ranch, including running his cattle on the Ranch's pastures. On May 1, 2003, Roberta sent an eviction notice to Blaine and his wife, Helen Sherman. The notice informed Blaine that he was to vacate the Ranch by May 15, as well as remove his livestock.
It was at this time that Roberta brought her son Galen Sherman onto the Ranch to help run it, but both Blaine and Frances had reservations about Galen running the Ranch. Shortly after Blaine was given notice to leave the Ranch, Blaine and Frances determined that Blaine needed to remain involved with the Ranch. Therefore, acting as trustees, Blaine and Frances executed a lease of the Trust's real property (Lease) to Blaine and Helen for $8 per acre. Roberta was not consulted regarding the Lease or any of its terms, but a copy of the proposed lease was sent to her before it was executed on May 27, 2003. On November 16, 2004, Roberta made a written offer to lease the same land for $16 per acre, but her offer was not accepted by Blaine and Frances.
Blaine and Helen had secured their operating loan from the Purdum State Bank of Purdum, Nebraska, for a number of years. Apparently because of the bank's concerns about the financial stability of Blaine and the Ranch, the bank sought additional security. Thus, on June 24, 2003, Blaine and Helen executed a "Collateral Assignment of Accounts Receivable" (Assignment) to the Purdum State Bank that in pertinent part read as follows: "Blaine Sherman and Helen Sherman ... hereby assign, transfer and set over to the Bank, all of their right, title and interest in respect to any and all sums of money now due or to become due from Roberta Sherman, whatsoever."
Shortly after Blaine and Frances leased the Trust's ground to Blaine, Roberta brought suit on July 1, 2003, in the district court for Cherry County, requesting that the Lease be voided, Blaine and Frances be removed as trustees, and Blaine be ejected from the Ranch. Blaine counterclaimed, seeking Roberta's removal as *172 trustee, a monetary judgment against Roberta on a promissory note in the amount of $119,300 payable to the Trust, and judgment based on quantum meruit for an amount in excess of $350,000 for Blaine's work on and management of the Ranch. After a lengthy bench trial, Blaine, Frances, and Roberta were removed as trustees and the Lease was voided. Roberta was ordered to pay the Trust $119,300 plus interest. Judgment was entered for Roberta on the remainder of Blaine's counterclaims. Blaine and Frances timely appealed.

ASSIGNMENTS OF ERROR
Blaine and Frances assign, restated, that the district court erred in removing them as trustees; in voiding the Lease; in determining that no contract existed between Roberta and Blaine to make a will; in determining that Blaine lacked standing to bring his counterclaim against Roberta because of the assignment to the Purdum State Bank; in entering judgment for Roberta against Blaine and Frances on their counterclaims for compensation and reimbursement of expenses, when the court had found that Blaine lacked standing to assert such counterclaims against Roberta because of the Assignment to the Purdum State Bank; in determining that the Assignment was ambiguous; and in overruling the motion for new trial. Blaine and Frances also claim that the trial court's judgment and posttrial "Order on Motions" were not supported by sufficient evidence. We do not address this last assignment, because it is not argued in Blaine and Frances' brief. Errors that are assigned but not argued will not be addressed by an appellate court. State v. Baue, 258 Neb. 968, 607 N.W.2d 191 (2000).

STANDARD OF REVIEW
Where an action at law is tried without a jury, the decision of the trial court has the effect of a jury verdict and will not be disturbed on appeal unless it is clearly wrong. See South Sioux City Star v. Edwards, 218 Neb. 487, 357 N.W.2d 178 (1984). It is not within the province of this court to resolve evidentiary conflicts or to weigh evidence. Rather, it is our obligation to review the judgment entered in light of the evidence and to consider the evidence in the light most favorable to the successful party, resolving all conflicts in his favor and granting him the benefit of every inference which is reasonably deducible therefrom. See Grubbs v. Kula, 212 Neb. 735, 325 N.W.2d 835 (1982).
Appeals of matters arising under the Nebraska Probate Code, including trust administration proceedings and proceedings to remove trustees, are reviewed for error on the record. See In re Loyal W. Sheen Family Trust, 263 Neb. 477, 640 N.W.2d 653 (2002). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. Id.

ANALYSIS

Is Lease Between Blaine and Helen and Trust Void?
There is competent evidence that Blaine and Frances violated their duties as trustees by entering into the Lease, and the voiding of the Lease is an appropriate remedy for such violation. Neb.Rev. Stat. § 30-3867 (Supp.2007) describes a trustee's duty of loyalty:
(UTC 802) (a) A trustee shall administer the trust solely in the interests of the beneficiaries.
(b) Subject to the rights of persons dealing with or assisting the trustee as *173 provided in section 30-38,101, a sale, encumbrance, or other transaction involving the investment or management of trust property entered into by the trustee for the trustee's own personal account or which is otherwise affected by a conflict between the trustee's fiduciary and personal interests is voidable by a beneficiary affected by the transaction unless:
(1) the transaction was authorized by the terms of the trust;
(2) the transaction was approved by the court;
(3) the beneficiary did not commence a judicial proceeding within the time allowed by section 30-3894;
(4) the beneficiary consented to the trustee's conduct, ratified the transaction, or released the trustee in compliance with section 30-3898; or
(5) the transaction involves a contract entered into or claim acquired by the trustee before the person became or contemplated becoming trustee.
(c) A sale, encumbrance, or other transaction involving the investment or management of trust property is presumed to be affected by a conflict between personal and fiduciary interests if it is entered into by the trustee with:
(1) the trustee's spouse;
(2) the trustee's descendants, siblings, parents, or their spouses.
Here, Blaine was a trustee, and therefore his lease of the land runs afoul of the general prohibitions against self-dealing by a trustee. Additionally, his wife, Helen, was a lessee on the Lease, creating a presumption of a conflict of interest. Further, the district court found that although Blaine paid $8 per acre to lease the Trust's portion of the Ranch, Roberta offered $16 per acre. Leasing the ground for the lower price is facially inconsistent with Blaine's and Frances' duty to act for the benefit of Roberta, the life beneficiary, and for the remaindermentheir seven siblings. The district court found that Blaine and Frances failed to take account of Roberta's interests by not leasing the Ranch to her and, we would add, failed to take into account the remaindermen's interests. The evidence also suggests that Blaine and Frances were more concerned about their own interests in the Ranch, which they were ultimately to inherit along with their siblings, and they set their interests in the Ranch and the Trust property above their duty to Robertathe life income beneficiary. The evidence supports the conclusion that Blaine and Frances failed in their duty of loyalty to the beneficiary of the Trust, Roberta, when they entered into the Lease. The district court found that the Lease created a conflict of interest for Blaine and Frances, and this finding is not erroneous, because it is supported by competent evidence. Section 30-3867 makes such a transaction voidable by the beneficiary, in this case, Roberta. Therefore, it was an appropriate remedy that the Lease be voided.

Removal of Blaine and Frances as Trustees.
Pursuant to Neb.Rev.Stat. § 30-3862 (Cum.Supp.2006), the court has the authority to remove a trustee if (1) the trustee has committed a serious breach of trust or (2) lack of cooperation among cotrustees substantially impairs the administration of the trust. The district court found that both Blaine and Frances committed serious breaches of trust. This finding was not error, because it was based on the competent evidence, described above, that not only did Blaine and Frances act without taking Roberta's best interests into account, they also engaged in self-dealing, because the evidence suggests that their motivation for entering into the Lease and refusing to lease the Trust land to Roberta *174 was their concern that Galen could not properly run the Ranch. The evidence did not show this to be a valid concern; in fact, the evidence suggests improvements under Galen's stewardshipfor example, in the condition of the pastures and the decreased number of open cows.
Moreover, while the trial court did not specifically make findings concerning such, the fact that Blaine and Frances, as well as Roberta, operated as though there was no Trust is also a serious breach of their duties. The seriousness of this shortcoming is perhaps best understood by pointing out the inherent complexities of the Ranch after Hugh's death. After Hugh's death, the Ranch was composed of approximately 6,000 acres of leased ground plus 9,000 acres of owned land, of which an undivided half was owned by Roberta and the other undivided half was owned by Hugh's three trustees. While we need not discuss all of the ramifications of this arrangement, suffice it to say that the ownership arrangements of the land, coupled with the fact that Blaine was running his own cattle on the Ranch's land, made for a complex situation that required sophisticated recordkeeping for a variety of purposes. However, all three trustees were apparently largely oblivious to the ramifications of the complicated ownership of the land, as well as their fiduciary duties as trustees. The record shows that for years, the trustees made no efforts to separate Trust property and Trust income from the portion of the Ranch owned individually by Roberta, and the income that such generated. There was a variety of serious breaches of the trustees' duties, and removal was an appropriate remedy.

Did Contract Exist Between Roberta and Blaine for Her to Make Will?
Blaine asserts that Roberta contracted to make a will leaving that portion of the Ranch she owned to him in exchange for his coming back to the Ranch and operating it after Hugh's death. There is no contract between Roberta and Blaine for Roberta to make a will with such provision, because there is no writing that satisfies Nebraska law governing such a contract. Neb.Rev.Stat. § 30-2351 (Reissue 1995) provides:
A contract to make a will or devise, or not to revoke a will or devise, or to die intestate, if executed after January 1, 1977, can be established only by (1) provisions of a will stating material provisions of the contract; (2) an express reference in a will to a contract and extrinsic evidence proving the terms of the contract; or (3) a writing signed by the decedent evidencing the contract. The execution of a joint will or mutual wills does not create a presumption of a contract not to revoke the will or wills.
At trial, no required writing falling within any of the three possible categories for a valid agreement to make a will as required by § 30-2351 was introduced into evidence. The district court found there was no contract to make a will, and such conclusion is quite clearly correct.

Did Blaine Have Standing to Sue Roberta?
In the pleadings, Roberta asserts that Blaine did not have standing to bring his counterclaim against Roberta for quantum meruit compensation for working and managing the Ranch and for expenses advanced. Before a party is entitled to invoke a court's jurisdiction, that party must have standing to sue. See Ponderosa Ridge LLC v. Banner County, 250 Neb. 944, 554 N.W.2d 151 (1996). The trial court's judgment discusses in detail whether Blaine had standing to assert such claim against Roberta, given the assignment to the Purdum State Bank. This judgment as well as the trial court's ruling on posttrial motions suggest rather clearly that *175 the court intended to rule that Blaine lacked standing. However, its decision on Blaine's claim found in the judgment necessarily carries with it the implicit conclusion that Blaine had standing to sue Roberta.
The order portion of the judgment reads: "6. Judgment is entered for [Roberta] and against the defendant, Blaine Sherman, on his counterclaim." Clearly, the quoted portion of the judgment is a finding on the merits. In order to make such a finding, the party bringing the claim, in this case, Blaine, necessarily would have had to have standing. In summary, the order portion of the judgment quoted above is inconsistent with the trial court's discussion of the issue in both the judgment and the "Order on Motions." Therefore, we turn to the merits of the standing issue.
In the Assignment, Blaine and Helen, as an inducement to the Purdum State Bank's forbearance of collection on promissory notes signed by them, agreed to the following: "Blaine Sherman and Helen Sherman... hereby assign, transfer and set over to the Bank, all of their right, title and interest in respect to any and all sums of money now due or to become due from Roberta Sherman, whatsoever."
An assignment is a transfer vesting in the assignee all the assignor's rights in property which is the subject of the assignment. See Craig v. Farmers Mut. Ins. Co., 239 Neb. 271, 476 N.W.2d 529 (1991). Blaine's Assignment clearly vested in the assignee, Purdum State Bank, all of Blaine's rights in any money Roberta owed or could owe Blaine. The Nebraska Supreme Court said in Tilden v. Beckmann, 203 Neb. 293, 300, 278 N.W.2d 581, 586 (1979), that "the intention of the assignor must be to transfer a present interest in the debt or fund or subject matter; if this is clearly expressed, the transaction is an assignment; otherwise not." Blaine argues that he did not assign a present interest to Purdum State Bank, but only a future interest, and that he was assigning only money "potentially" received from Roberta, not the right to sue on the cause of action to collect money from her. Brief for appellants at 27, citing Craig v. Farmers Mut. Ins. Co., supra. In Craig, Robert Craig sold his ranch, but the buildings had been damaged before the sale, and Craig, as part of the sale agreement, agreed to "assign to Buyer ... all right, title and interest of [Craig] to any insurance proceeds for damage ... prior to the date of [the sale]." 239 Neb. at 273, 476 N.W.2d at 531. When Craig sued his insurer, the insurer argued that Craig lacked standing due to the contract provision discussed above. The Supreme Court found that the provision at issue made closing of the sale possible and that it was not an assignment of policy rights, but, rather, an agreement to assign the proceeds of the policy. Therefore, Craig was found to have standing to sue on the policy. The use of the term "proceeds" in the language of the Craig assignment was clearly a limitation on what was assigned, and such a limitation is missing here. And, in Craig, there was something "left behind" after the assignment, because Craig would retain the right for fees and costs under Neb.Rev.Stat. § 44-359 (Reissue 2003), as well as some measure of control, because the proceeds went to the buyer only if used for purposes of repair or improvement of the property. In contrast, Blaine and Helen have not limited the scope of the assignment, nor have they retained anything.
The Craig court quoted from Tilden v. Beckmann, 203 Neb. at 300, 278 N.W.2d at 586, which stated, "It is also the rule that the intention of the assignor must be to transfer a present interest in the debt or *176 fund or subject matter; if this is clearly expressed, the transaction is an assignment; otherwise not." However, the language of the Assignment in this case is clear that it applies to both Blaine's present and future interests ("to any and all sums of money now due or to become due from Roberta") (emphasis supplied). We conclude that Craig is distinguishable from the present case and that Blaine has assigned away his claims, present and future, against Roberta.
Neb. Rev. Stat. § 25-301 (Cum. Supp.2006) provides, "Every action shall be prosecuted in the name of the real party in interest ..." To determine whether a party is a real party in interest, the focus of the inquiry is whether that party has standing to sue due to some real interest in the cause of action, or a legal or equitable right, title, or interest in the subject matter of the controversy. Stevens v. Downing, Alexander, 269 Neb. 347, 693 N.W.2d 532 (2005). By executing the Assignment, Blaine (and Helen) ceased to have any interest in the counterclaims he brought against Roberta. Therefore, he did not have standing to sue.
That decided, as we noted earlier, the trial court actually decided the counterclaim in Roberta's favor, which was error because of the lack of standing. Blaine's counterclaim should have simply been dismissed due to the court's lack of jurisdiction. See Spring Valley IV Joint Venture v. Nebraska State Bank, 269 Neb. 82, 690 N.W.2d 778 (2005) (in order to invoke court's jurisdiction, one must have standing). Therefore, we modify the trial court's judgment such that Blaine's counterclaim against Roberta is dismissed, and the finding in Roberta's favor on such is reversed and vacated.

CONCLUSION
For the reasons stated above, we affirm the district court's order in part and reverse and vacate in part.
AFFIRMED IN PART, AND IN PART REVERSED AND VACATED.